THE SOUTHERN LIFE INSURANCE AND TRUST COMPANY, AP-
PELLANT, VS. AUGUSTUS H. LANIER, APPELLEE.

1. Matters *dehors* the bill, showing a want of interest in a complainant, cannot be set up by way of demurrer, but may be raised by way of plea. The attempt to set them up in support of a demurrer, is fatal to it.

2. Where a party is made a co-plaintiff, without his privity or consent, the proper motion is, that his name be stricken out, not that the bill be dismissed, even as to him.

3. A demurrer upon the ground of misjoinder of a complainant, must be presented *in limine*. A party omitting to do so, and going into the merits of a case, waives his demurrer, and the Court will not, except in a special case, allow it to prevail at the hearing.

4. Where a party voluntarily receives, as a loan, bank bills which were at a discount, and gave his note for their nominal amount, payable in *money*, he cannot set up as a defence that the amount borrowed was not specie, or its equivalent.

5. Where the charter of incorporation of a Banking Company required that subscribers should, at the time of subscription, pay to the Commissioners appointed to open books for that purpose, ten per cent. on each share of stock subscribed, and directed that, so soon as the stock was taken and the ten per cent. paid, trustees were to be elected, and the Company fully organized; and by an amendatory act, passed after its organization, the Company was authorized to allow any stockholder to surrender his certificate of stock, and take a certificate of full stock equal to the amount actually paid in by him, which surrendered stock the Company was authorized to re-issue : HELD, 1, That the Company were not bound to require of the purchaser of this surrendered stock a payment of ten per cent. on each share of stock so purchased: 2, That the terms of the original charter has exclusive reference to the subscribers before the corporation was organized; and 3, That the Company and not the Commissioners had the power to re-issue the surrendered stock.

6. Where, by the terms of the charter, a Banking Company was authorised to sell surrendered stock for cash, and invest the amount in bonds and mortgages and instead thereof, it received the bond and mortgage of an individual di-

rectly, as a consideration for the stock issued to him : HELD, That the individual stockholder could not avail himself of this conduct of the Company to avoid his bond so given.

7. A party cannot avoid his contract with a corporation, and thereby diminish the fund which was designed as a security for the benefit of the public, upon the pretence that there was some abuse of the corporate powers, or mismanagement on the part of the Board of Directors, in making the contract.

8. A contract with a corporation may be binding on the parties, though it be an abuse of the corporate powers, for which the corporation may be answerable to the government which created it.

9. Where a grant of power is clearly defined, and no mode is prescribed for its exercise, it is for the corporation to adopt such mode as, in its judgment, will secure the purpose contemplated.

10. As a general rule, a grant specifying the mode and manner of exercising powers, is construed as merely directory, unless there are negative words, excluding the right to adopt any other mode.

11. It is the duty of a party, upon discovering a fraud, to take immediate steps for the rescision of his contract. By his ratification of the acts of which he complains, and to which he was a willing party, he is forever estopped from setting up such a defence.

12. When a corporation becomes insolvent, the officers are trustees for creditors, and the same principles of law which would be applicable to a suit in favor of creditors, apply to a suit instituted by a corporation under such circumstances.

This cause was brought up by appeal from a decree of the Circuit Court for Gadsden County, sitting in Chancery.

In July, 1839, Augustus H. Lanier executed his bond to the Southern Life Insurance and Trust Company, in the penal sum of twenty thousand dollars, conditioned to pay the sum of ten thousand dollars, on or before the expiration of five years from the date thereof, with interest at eight per cent. per annum, payable semi-annually. On the same day, he also executed a mortgage to said Bank on certain lands and slaves, to secure the payment of said bond.

On the execution and delivery of the bond and mortgage

aforesaid, the Southern Life Insurance and Trust Company issued to said Lanier a certificate for one hundred shares of stock in said Company, which constituted him a stock-holder in said institution. Afterwards Lanier, desiring to borrow money from said Company, deposited with it his certificate of stock, and procured loans, for which he gave his notes ; one dated 1st July, 1842, for $917 17, due six months after date, and one dated 8th February, 1843, for $6,000, payable the first of January thereafter, and agreed that his said certificate of stock should stand pledged as a security for said loans. These notes were renewals of oth-ers, the original evidences of the loans.

This bond and mortgage, with others, were, it is alleged, under the charter of the company, deposited with the Gov-ernor of the Territory of Florida, and the guaranty of said Territory of certificates for one thousand dollars each, to the amount of the mortgage debts deposited, was obtained, on the faith and pledge of said bond and mortgage. These certificates were afterwards negotiated and sold by the Com-pany, with the view of being able to make loans and dis-counts beyond the amount of the capital paid in by the old stockholders.

The Company, in their bill, allege that out of the pro-ceeds of the sale of the certificates guaranteed by the Terri-tory, it made the accommodation loan to said Lanier, amounting to $6,917 17, as evidenced by the two promis-sory notes mentioned. The bond and mortgage being un-paid, a bill was filed by the Company, to which the State of Florida was made a party complainant, to foreclose the mortgage, and for a sale of the property, and the applica-tion of the proceeds to the payment of the amount due.

The respondent, Lanier, admitted the execution of the bond and mortgage, but denied that there was any consid-eration for their execution and delivery. He averred that

they were extorted from him by the deception and fraudulent misrepresentations of one Samuel L. Burritt, who, acting as the agent of the said Company, procured the said bond and mortgage to be executed by him. He further alleged that said Burritt, in order to induce him to execute said bond and mortgage, represented that said Company was a banking institution in perfectly solvent circumstances, and possessed of ample means to do a profitable business, and that the primary, and indeed only objects of the execution of the bond and mortgage were, first, to comply with the *form* required by the charter of incorporation, and secondly, to afford security for any loans of money which might be made to the stockholders upon a pledge of his stock, and that, under no circumstances, would the obligor be called upon to pay the amount of the bonds; that, as a further inducement held out by said agent to persuade defendant to execute said bond and mortgage, he represented that said banking institution would immediately resume specie payments, and would extend to its stockholders great facilities for the borrowing of money, upon simply a pledge of their certificates of stock. Defendant further alleged, that some short time after he had executed and delivered his bond and mortgage, he learned that all the inducements which had been held out to procure the execution of the said bond and mortgage, were not only groundless fictions, but the most gross and fraudulent misrepresentations; that, instead of being at that time in solvent circumstances, the said association was lately insolvent, and its insolvency was well known to the Directors who managed its business; that said Directors never intended to act in good faith, but resorted to this scheme as a means of saving from ruin those who had previously become stockholders. Defendant, Lanier, denied that he had any knowledge that the object in obtaining said bond and

mortgage was to obtain funds for banking purposes, and averred that if such was the object, it was carefully conceal- ed from him, and he insisted that if funds were thus raised, it was, in fraud of the new stockholders, fraudulently mis- appropriated to the payment of losses which had been sus- tained by the old stockholders.

Lanier further presented in his answer as a defence, that there was no authority in the charter of incorporation to se- cure stock, otherwise than by actual payment of cash, and as he never paid any cash, he insisted that he never was legally a stockholder in the said institution, and that the grant of the certificate of stock to him was in direct fraud of the charter. The answer further sets forth, that the loan promised to defendant at the time his bond and mort- gage were executed, was to be in par funds, but that on demanding it, par funds were refused, and he was told that he could get nothing but notes of the Union Bank, which at the time were not worth more than forty or fifty cents in the dollar. He received this money and executed the notes hereinbefore mentioned, but asserted that it was with the understanding that he would be allowed to pay back the amount in funds of the like character. The answer al- leges mismanagement and partiality on the part of the di- rectors, in favor of the old stockholders, in fraud of the rights and to the great injury of the new stockholders, and concludes by setting up by way of demurrer to the bill, that the " State of Florida," who is set forth as one of the complainants, has no interest in the subject matter of the bill, either as successor to the liabilities of the late Terri- tory of Florida for the guaranty referred to, or as assignee of defendant's bond and mortgage, or in any other, capaci- ty. That the Governor of the State had no authority to institute proceedings without the authority of the Legisla- ture, and that the Territory of Florida had by repeated

resolves of its legislative authority, declared all such guarantees as were given to this institution, to be wholly null and void.

The testimony of several witnesses establishes, that Burritt, the agent of the Bank, did make generally, such representations as to the solvency of the Bank, the benefits to the stockholders, &c., as are spoken of in the answer and that the mode by which the stock was obtained, was by the applicant for stock executing his bond and mortgage, and receiving a draft on New York, which draft was delivered to the Bank in payment for the certificate of stock. There was no proof, however, that these representations were made to defendant. The testimony further establishes, that the funds usually loaned on a pledge of the certificate of stock, were Union Bank bills, which were at the time depreciated, or other money that was under par. Several of the witnesses testified, that the losses sustained by the company, were from engagements entered into prior to 1839, and that as far back as 1841, the company was insolvent. It was further testified that the inducements held out by Burritt, the agent, were that the stockholders would have the right to a loan in specie funds equal to three-fifths of the amount of their stock, and that, the dividends which they would receive would be equal to the interest on their loans, and finally, that the stockholders, by the payment of the amount, would relieve their property from the operation of the mortgage. One of the witnesses, who had been appointed an officer in the Bank in November, 1839, testified, that the company paid specie for their notes in St. Augustine, until April or May, 1840. This witness further testified, that at the time the company opened its office in Tallahassee, viz : in the autumn of 1839, it was not embarrassed, but as near as he recollected, the effects of embarrassed circumstances first began to appear in the fall of 1840. The

cause of embarrassment, was losses upon sales of land, and failure to sell others, and also inability to collect debts; this cause had its origin, he thinks, subsequent to July, 1839. Another witness, who was appointed cashier, in October, 1839, stated that when the company opened its office in Tallahassee, at which place he acted, "it was not *seriously* embarrassed; it paid specie for its bills at that time," and that he found it embarrassed in the fall of 1840. He further stated, that the specific cause of the embarrassment was the non-payment by its debtors of demands due to it, but he could not say when the debts were contracted, the failure to pay which caused the embarrassment.

The defendant also introduced as evidence, a bill in chancery, filed by the complainant in 1848, against John H. Prentice and William S. Packer, in which the following allegation is made, viz: " that in or about the month of October, one thousand eight hundred and forty, and *for a long time previous thereto*, your orator has been and was greatly embarrassed in affairs, for want of money to meet its engagements, and in consequence of such embarrassment, your orator, in the *summer immediately preceding* said month of October, 1840, had suspended payments in specie, as well at their branch in the city of New York, as at their principal office in the city of Tallahassee, and had entirely or in a great measure, ceased from the transaction of business, and from making new engagements."

The defendant also offered in evidence, the following circular, and extract from the minutes of the company :

Southern Life Insurance and Trust Company,

Branch, Apalachicola, May 13, 1839.

Sir :—The following information is communicated for the benefit of such as wish to subscribe to stock in this company :

Bonds and mortgages will be received upon good pro-

ductive plantations, and negroes worked on the same, or upon good soil, with woodlands eligibly located in the Territory of Florida, to the amount of half the appraised cash value of such lands and negroes, and the stock of the company at par will be issued in exchange for such bonds and mortgages.

Preference will be given in case of excess of subscription, to such as offer security on improved productive plantations and negroes.

The mortgages to draw interest to the company at eight per cent. per annum, payable semi-annually on the first days of June and December, and the stock to draw dividends semi-annually to the holder.

The dividends heretofore have been five per cent. semi-annually. In connexion with the arrangements, the company made a loan upon the stock and note of the holder, to the amount of three-fifths (3–5ths) its par value, to run as long as the mortgages and bonds, interest on the same payable *semi-annually*. The mortgages can be paid in whole, or in part, (not less than five hundred dollars in any one payment,) at any time when an instalment of interest shall be due, by giving six months previous notice to the company.

No mortgage will be taken or stock issued for a less sum than one thousand dollars; nor for parts of hundreds of dollars, above that sum. As the company desire to close up the subscription of one million for Middle and West Florida, with as little delay as possible, the first applicants whose property is unincumbered, or who can soonest perfect the title papers will obtain stock; certificates from the county clerks, and clerks of the Superior and county courts will in all cases be required, that the title is perfect in the mortgagor, and that there are no incumbrances on the prop-

erty of any description prior to the execution and record of the mortgage to the company.

Appraisers for the several counties will be furnished with appraisal blanks, and forms of bond and mortgage will be sent to most of the lawyers in Jackson, Gadsden, and Leon counties, on any of whom the applicants can call to have the papers made out, and with whom they can settle for the same. It is understood, that in all cases, the applicant is to pay the expenses of drawing and recording papers, and also the appraisal fee to the commissioner, which last item, by the charter of the company, is fixed at five dollars. A certificate according to form, from one commissioner, is sufficient in each case. The company will not take mortgages on pine land, except in very moderate quantities, connected with good hard timber, and hammock land, suitable to the growth of cotton ; nor generally on negroes, unless they are located on plantations. Samuel L. Burritt, Esq., will remain in Tallahassee during June, July, and August, to attend applications from Jackson, Gadsden, Leon, Jefferson, Madison, and Columbia Counties, and those who wish stock are invited to make early application to him, at that place personally, or by letter. In cases where the loan of money is perfected before, it will be made during the coming winter, the stock meanwhile is drawing to the holder, according to the dividends heretofore, two per cent. per annum, more than the mortgages draw interest to the company.

When the cash loan is made on the hypothecation of stock, the stockholder or mortgagers still draw dividends. The names of commissioners to make valuation, will be published in the Tallahassee papers.

The readiest way for applicants to complete the business, is to call on some lawyer in the county, where such applicant resides, who will attend to making out the bonds and

So. Life Ins. & Trust Co. vs. Lanier.—Statement of Case.

mortgages, and forwarding them to Mr. Burritt, with deductions of titles, clerk's certificates, &c., and receive the certificate of stock; and such attorneys as intend to aid applicants in obtaining stock, are invited to apply to the undersigned at Apalachicola, or to Mr. Burritt, at Tallahassee, for such further information as they may need.

A relinquishment of dower on the part of the wife, must in all cases accompany the mortgage.

Respectfully your obedient serv't.

State of Florida, Leon County : ·

I, Oscar A. Myers, Clerk of the Circuit Court for the County aforesaid, do hereby certify that the foregoing is a true copy of the original, on file in my office.

Witness my hand and the seal of said Court, this 24th day of August, A. D. 1850, and of the Independence of the United States the 75th year.

[L. s.]

OSCAR A. MYERS, *Clerk*,
By HUGH ARCHER, *D. C.*

Extract from the Minutes at St. Augustine.

·" At a meeting of the Board, February 8th, 1839, present, L. Clark, President, And. Anderson, Thomas Douglass, J. L. Smith, A. M. Reid, it was ordered that the Southern Life Insurance and Trust Company, having had a portion of their stock surrendered to them, in pursuance of an amendment to their charter, passed in February, 1838, are prepared to recieve applications for their stock at par, on the pledge of bonds and mortgages upon improved unincumbered real and personal estate, held in severalty, in Florida, to the amount of one million of dollars, at their office at Apalachicola. A loan for as long a period as the mortgage has to run, will be made upon stock, to the amount of 3-5 (three-fifths) its par value. So soon as arrangements can be made, and it can be ascertained what amount is wanted, one half the amount of 1,000,000 will be

appropriated to Middle and one half to West Florida. No individual will be allowed to have more than fifteen thousand dollars of stock. Proposals must be accompanied by a certificate of approval from duly appointed Commissioners, and also by evidence of title."

The Court below decreed, that the bond and mortgage executed by Lanier were unauthorized by, and in violation of the charter of the company, and were without any legal or valid consideration, and therefore, null and void; also that the promissory notes mentioned constituted no lien on the property specified in the mortgage, so as to entitle the complainant to a decree of foreclosure, and that the bill of complaint be dismissed.

On petition filed, an order of severance from its co-complainant, for the the purpose of an appeal, was granted to the Southern Life Insurance and Trust Company, and an appeal was accordingly taken from the decree of the Court below.

*James T. Archer* opened for the appellant.

*Charles H. DuPont* for appellee.

I. The first point which we make, is one which is raised in the answer, and which is, under our statute, insisted upon as if it had been raised by demurrer.

"*The State of Florida*," which is joined as a co-plaintiff with the "Southern Life Insurance and Trust Company," it is clear, from the face of the bill, has no interest in the suit, and the bill should therefore be dismissed.

1. The objection is good on general demurrer. 4 Russell En. Ch. Rep., 225, King of Spain vs. Machado; 4 Russell En. Ch. Rep., 242, Cuff vs. Platell; 4 Russell En. Ch. Rep., 244, Makepeace vs. Haythorne; 2 Simons En. Ch.

Rep., 237, Delondre vs. Shaw ; 5 Paige R., 336, Clarkson vs. DePeyster ; 4 Paige R., 510, Watertown vs. Cowen.

2. Or it may be set up and insisted upon in the answer; and in such case it is a ground for dismissing the bill. Mitf. Ch. Plead., [5 Lond. Ed.,) 400–1, citing 4 Law Journal, (A. S.,) 174, Goodyear vs. Robinson ; 4 Paige R., 510, Watertown vs. Cowen.

II. Although the execution and delivery of the bond and mortgage exhibited with complainant's bill is admitted, yet the consideration thereof is *impeached for* "*fraud*" *and* "*illegality.*" "*Fraud*" in the erroneous and false representations of the condition of the Company and the value of its shares of stock ; and "*illegality*" in that the Company was not authorized by its charter to receive subscriptions to or make sale of shares of stock upon *mortgage of property*, or in any other mode than by the payment of *money*, and the transaction is thus illegal and void.

1. The transaction is void for "*illegality.*"

No stock passed by the transaction, even if it were such as it was represented to be. It was in violation of the spirit, true intent and meaning, as well as against the letter of the charter of incorporation.

"Whenever the *consideration* which is the ground of the "promise, or the *promise* which is the effect or conse-"quence of the consideration, is unlawful, the whole con-"tract is void." 2 Caine's R., 147, Belding vs. Pitkin.

How was stock to be acquired, in accordance with the provisions of the charter of this Company ?

The 12th section of the charter provides that the stockholders shall, at the time of subscribing, pay "*ten dollars* on each share by him subscribed ;" in six months thereafter *ten dollars* more, and the residue within three years. Vide Thomp. Dig., 313.

It is true that "*specie*" is not actually prescribed in

16

*terms*, but the term " *ten dollars*" can have no other legal signification. If there were any doubt as to the *intention* of the Legislature in regard to this point, this doubt is dissipated by reference to the 11th section of the charter, which provides for the appointment by the Governor of a Commissioner, who is to examine into the condition of the Company, to ascertain if $200,000, in " *specie*," or its " *equivalent*," has been paid in ; to examine the officers, on oath, that it has been paid in, as the first installment of capital, and for no other purpose, &c. ; and on his report, the Governor is to issue his proclamation, &c.  Vide Thomp. Dig., 313.

And section 19 authorizes the issue of bills and notes only to the amount of capital actually paid in.  Vide Thomp. Dig., 314.

The 12th section further provides that if any shares of stock be *forfeited*, they shall be re-issued in the manner prescribed in the 9th section, which authorizes books of subscription to be opened, under the superintendence of Commissioners.

The amendatory act of 1838 provides for the surrender of shares and the consolidation of the amounts paid thereon, on the shares retained by stockholders, and the re-issue of the shares so surrendered, but introduces no " *new rule*" as to the mode of paying for the shares of stock to be re-issued ; consequently, the *old rule* in regard to original subscriptions, or re-issue of *forfeited* stock, as prescribed by the 9th section, must prevail.

If the amendment of 1838 has, in its operation, abolished the *old rule* for the security or purchase of stock, then any *new rule* which may be applied to the security or purchase of the " *re-issued shares*," must depend for its authority, not upon any provision of the charter, but wholly upon the arbitrary and interested *will of the corporators*.

If the amendment of 1838 has *impliedly*, (for it certainly has not *expressly*,) abolished the *old rule* in regard to the mode of paying for stock, why may not the argument apply with equal force to *every* other provision of the *original* charter? It is very certain that the application of the *new mode* of securing stock by bond and mortgage, practically removes the restriction upon the amount of bills and notes to be issued, and very unwisely dispenses with the wholesome guaranty for a safe and sound circulating medium, which is provided for in the 11th section.

In 1839, the Company appointed Samuel L. Burritt, Esq., an agent to proceed to Middle and West Florida, "to obtain mortgages for stock—to fill up stock by receiving bonds, secured by mortgages, upon real and personal property."

Under this agency, the 100 shares of stock were granted to the defendant, Augustus H. Lanier, and the bond and mortgage in question given therefor.

We contend that the corporation was not authorized, by its charter, to receive the bond and mortgage upon such consideration, and no stock, or shares of stock, passed to the defendant, A. H. Lanier. 21 Wend. R., 219, Crooker vs. Crane; 5 Sm. & Mar. R., 448, King vs. Elliot; 5 Sm. & Mar. R., 539, Hayne vs. Beauchamp; 15 Maine R., 428, Merrill vs. Ball; 4 Ala. R., (N. S.) 559, Smith vs. Al. Life In. & Trust Co.; 3 Strobhart R., 245, Charlotte & S. C. R. R. Co. vs. Blakely.

Where a corporation relies upon a grant of power from the Legislature to do an act, it is as much restricted to the mode prescribed by the Statute for its exercise as to the thing allowed to be done. 5 Barb. R., 649, Farmer's Loan & Trust Co. vs. Carrol; 2 Strobh. R., 245, Charlotte & S. C. R. R. Co. vs. Blakely; 1 Peter's Con. R., 375, Head vs. In. Co.; 7 Cowen R., 465, Dawson vs. Northn. In. Co.

The transaction contravenes the policy of the statute. The policy of requiring capital to be paid in, is very correctly stated by Ch. J. Sharkey, in 5 Sm. & Mar. R., 444–445. So contravening the policy, it is an imposition on the public—it is iniquitous, therefore void.

Every contract, the consideration of which is tainted with illegality, is void. Illegality exists when the act is either expressly prohibited, or when the prohibition is implied from the nature and object of the statute. Story on Con., 104, § 162; Story on Prom. Notes, 204, § 189; 1 Story Eq. Ju., § 296; 2 Wilson's R., 347.

It will not do to urge that the Company did not intend to violate the law. Parties must be presumed to intend the natural and ordinary consequences of their acts. 9 B. & C. R., 643, Haire vs. Wilson; 5 Cowen R., 573, Mackie vs. Cairnes.

Where the fact of an actual contravention of law is established, no innocence of intent, however perfect, can avert the legal penalty. The Hoop, 1 Robs. Abdm., 216.

The law says, that where a man does an act to defraud the intention of the legislature, he shall suffer all the inconveniences of his act. 6 Vesey, Jr. R., 747, Curtis vs. Perry.

In Collins vs. Blantern, L. C. J. Wilmot says, the reason why such contracts are void, is for the public good—you shall not stipulate for iniquity. 1 Smith Lead. Cases, 154.

There is something monstrous in the proposition, that a Court of law will carry into effect a contract founded upon a breach of law. It is encouraging disobedience and giving to disloyalty its unhallowed fruits. 16 John. R., 486, Griswold vs. Waddington.

See also 2 Peter's R., 527; Bank U. S. vs. Owen.

Chancellor Kent, in his Commentaries, has summed up

the law on this subject, with great force and beauty of language. " The consideration," says he, " must not only be " valuable, but it must be a lawful consideration, and not " repugnant to law or *sound policy*, or good morals ; *ex* " *turpi contractu actio non oritur*, and no person even so " far back as the feudal ages, was permitted by law to stip- " ulate for iniquity," &c. &c.   2 Kent's Com. 466.

And again, " the Courts of justice will allow the objec- " tion that the consideration of the contract was immoral " or illegal, to be made, even by the guilty party to the " contract, for the allowance is not for the sake of the par- " ty who raises the objection, but is grounded on general " principles of policy."

" A *particeps criminis* has been held to be entitled in " equity *on his own application*, to relief against his own " contract, when the contract was illegal, or against the " policy of the law, and relief became necessary to prevent " injury to others.   It was no objection, that the plaintiff " himself was a party to the illegal transaction."   Vide 2 Kent's Com., 467, citing numerous cases.

A similar doctrine is sustained by the following authorities :   Story on Con., 103, § 159 to 162;  ib., 140, § 218 to 219.; ib., Prom. Notes, 214; 2 Will. R., 347, Collins vs. Blanton ; 2 Caines R., 149, Belden vs. Pitkin ; 12 John. R., 1 to 14, Yates vs. Foot.

If it be contended that in this case both parties are implicated, the mortgagor as well as the mortgagee, and both are equally culpable, granted ; and then we invoke the maxim " *in pari delicto potior est conditio defendentis.*"

NOTE.—It was contended on the trial below, that the defendant had *ratified* and *confirmed* and waived the fraud and illegality.   As to the waiver of the fraud, there is no evidence in the record, and as to the ratification and con- firmation of the illegality, it is not susceptible of ratifica-

tion or confirmation. Vide Story's Eq. Jur., § 306, where the doctrine is fully laid down.

III. *As to the fraud and misrepresentation.*

Whoever would seek admission into a Court of Equity, must come with clean hands. A Court of Equity will never interfere in opposition to conscience or good faith. 5 How. S. C. R., Creath vs. Sims; Buller's N. P., 235; Greenleaf, § 212.

The parties, i. e., the company by its agent, and the defendant, met the first for the purpose of selling shares in the stock of the company; the latter for the purpose of buying said shares. The *value* of the shares was dependent on the condition of the company as to its solvency, freedom from embarrassment, and prosperous state of its business, and consequently the representations as to these matters were *material* to the bargain.

The solvency of the company was a *material fact*, and whether the representation was known to be false to the vendor, or was made without knowing whether it was true or false, is wholly immaterial, for the affirmation of what one does not know to be true, is equally unjustifiable as the affirmation of what is known to be positively false.

Even if a party by *mistake* misrepresents a material fact, it is equally conclusive; for it operates as a *surprise* and *imposition* on the other party. Vide the doctrine fully laid down in 1 Story Eq. Jur., § 193 *et sequiter ;* 2 Kent's Com., 482, *et seq. ;* 1 Story's Rep., 260, Daniel vs. Mitchell; 2 ib., 732, Doggett vs. Emmerson ; 1 Woodb. & M. R., 92, Warner vs. Daniel; ib., 205, Doggett vs. Emmerson.

The condition of the company, and therefore the *value* of the stock was not only a *material fact*, but was a matter in which we are bound to believe the defendant did put a *trust* and *confidence* in the representations of the officers

and agents of the company. The defendant could presume that the condition of the company was better known to the officers of the company than to any one else. Certainly the defendant had not an equal opportunity with them of knowing the fact—he was bound to rely on their representations. 1 Story's Eq. Jur., § 197 *et seq.* ; ib., § 202.

The defendant was misled, and to his prejudice. 1 Story's Eq. Jur., § 202–203.

The company cannot say that the agent was unauthorized to make the representations. Even in the absence of evidence of previous *express* authority, when the company adopt the fruit of their agent's negociations, to wit : the bond and mortgage, they are bound to take the same *cum onere*, with his representations and acts. 13 N. Hamp. R., 149, Hovey vs. Blanchard ; 3 Story's R., 700–735-6, Doggett vs. Emmerson.

But there is in the record, evidence of *previous express authority* given to Samuel L. Burritt, the agent. Vide printed circular.

The same circular which purports to have been issued by the company, contains representations as to the business of the company, and especially as to the dividends which might be expected, and the advantage of borrowing money as to interest, &c.

These are the representations—what the reality ?

The office is opened in Tallahassee, in 1840. Almost immediately it is confessedly embarrassed, and finally insolvent.

See the bill filed by the company under its corporate seal against Packer, Prentis & Co.

If the company was solvent and doing a prosperous business in 1839, whence this irremediable insolvency and ruin which so rapidly supervened ?

This fact throws such suspicion on the truth and fairness

of the representations which were made to the defendant to induce him to execute the bond and mortgage, as to impose upon the company the *onus* of proving the good faith of the transaction.

We have not had such access to the books and transactions of the company as will enable us to demonstrate what the Bank has itself asserted, viz : that in the year 1840 its stock " was not worth $20 per share in the market, if intrinsically so much." Vide Bill vs. Packer, Prentis & Co.

A reference to the Master with the books, and the machinery which a Court of Equity possesses for eliciting the truth, would enable us satisfactorily to demonstrate the problem of the value of the stock of this company at the date of the execution of the bond and mortgage, set forth in complainant's bill of complaint.

It may be referred to as a matter of history, that this company was one which owed its birth to the unsound and inflated condition of trade and monetary concerns at the time of its creation. The period of 1835–6–7, in the Northern cities and in Europe, and which in our unfortunate Territory continued to a later period, say 1840, will long be remembered.

The company had for its first shareholders citizens and residents of the Northern States, principally of New York. Its first President and Cashier, indeed the successive Presidents and Cashiers, and other officers, until its hopeless insolvency was firmly established by assignments of the entire assets, were from the Northern States.

IV. The company commenced operations in 1835 or 1836 at St. Augustine, in East Florida, with, it is presumed, the 10 per cent. required by the charter, paid in. At the session of the legislature in 1836, they apply to have the next instalment postponed one year, which is allowed. Vide Thomp. Dig., 316.

In 1837, they apply for and are allowed a further postponement of *two* years. This is the period of the general commercial crash. Ibid.

In 1838 they apply for and are allowed to "*consolidate*" their stock, that is to say, the shareholders are permitted to "*surrender*" *nine* shares in every *ten*, and retain *one* as *paid in full.* Vide Thomp. Dig., 317.

Was there a reason for this desire to "*surrender*" stock, other than the very generous wish to permit the citizens of Middle and West Florida to participate in the "*semi-annual dividends of five per cent.*," referred to in the printed circular? It requires no very great astuteness of intellect to penetrate the real motive of these Wall street speculators.

By the charter, the shareholders having subscribed for a certain number of shares, they were liable and bound to pay the remaining *ninety* per cent. if necessary to meet the obligations of the company, and might be coerced so to do by creditors. 3 Mason's C. C. R., 308, Wood vs. Dummer; 19 Johns. R., 474, Slee vs. Bloom; 16 Conn. R., 593, Ward vs. Griswoldville Co.; Georgia R., 486, Hightower vs. Thornton; Angell & Ames on Corp.

At that period of Bank insolvencies and other commercial derangements, the possession of the shares was *onerous*, and it was no doubt thought a brilliant idea to escape the responsibility which menaced them, by obtaining the legislative permission to "consolidate" their payment of 10 per cent. upon a few shares, and "surrender" the balance—thus they hoped to wipe out all *responsibility* for any thing beyond the amount paid—they were willing to lose that, but nothing more.

There was probably a doubt about the success of this scheme as it stood, whether it was competent for the legislature thus to deprive the creditors of the Bank of a fund

17

which the law had raised for their satisfaction. An invasion of vested rights might have been thus made; but if the Bank could *re-issue* the shares so " surrendered," and obtain either money or mortgages of property from the *new* stockholders, they would escape responsibility; or at least have assistance in bearing the loss of the previous operations of the company, and in paying the existing creditors.

Do not the circumstances connected with this affair warrant the conclusion above stated, viz: that the only motive which induced the company to ask for permission to surrender and re-issue their capital stock, was to escape the personal responsibility which had been incurred by the original stockholders, by shifting it to the shoulders of the unsuspecting farmers of Middle and West Florida?

The condition of the company at this time is represented as highly prosperous—the stock yielding a dividend of 10 per cent. per annum, with flattering prospects of increasing prosperity. Nor is it reasonable to expect that holders of stock in a prosperous institution, yielding so large a dividend, shall, without consideration, surrender 9–10ths of their shares, in order that strangers may come in and participate in the profits of the enterprize, after all the trouble and risk consequent upon the *organization*, shall have been passed.

But it may be asked with some show of plausibility, why did the farmers of Middle Florida permit themselves to be deceived and deluded by such a flimsy exhibition of disinterested generosity? The answer is obvious—it is because they were farmers, and their deceivers the *wily* stockjobbers of Wall street.

We think that the allegation contained in the answer of defendant is fully sustained by the facts and circumstances connected with the execution and delivery of the bond and

mortgage, viz: that the primary object intended to be obtained by the "surrender," "consolidation," and "re-issue," of the shares of the stock, was to entrap the unwary agriculturists of Middle and West Florida into a subscription for the stock proposed to be re-issued, and thereby to shield from pecuniary *loss* the original stockholders of the said company, by saddling their responsibilities upon such citizens as might be thus imposed upon.

This is not the case of a *creditor* of the Bank suing a stockholder for *contribution*, to pay his debt. What assurance or guaranty have the court that the *creditors* of this Bank will be benefitted by the proceeds of a decree in this cause?

*M. A. Long*, on the same side.

*W. G. M. Davis*, for appellant.

The bill was dismissed in the Court below on the ground assumed in the answer, that the bond was illegal, it being given in violation of the act incorporating the appellant.

The proof in the case shows that the bond was given in consideration of a draft drawn by the Southern Life insurance and Trust Company, on its agent in New York, which draft was afterwards taken by the company in payment of one hundred shares of stock. It is not material to inquire whether any difference exists between a bond given directly for stock, or one given for a draft, or note, which is afterwards discounted, and the proceeds applied to the payment for stock, and therefore I do not particularly notice the evidence for the purpose of discussing that question, although the Supreme Court of Mississippi, in the case relied on by the appellee—Hayne vs. Beauchamp, 5 Sme. and Marshall, 515—found an important distinction between the two modes of paying for stock, which influenced the decision in that case. If this Court, however, should give

such weight to that decision, as it received in the Court below, then I ask that the facts in the record in relation to the giving the draft for the bond, the subsequent discount by the bank, and the application of the proceeds to pay for the stock, all of which is particularly described in the deposition of Hammond, be compared with the facts in the case of Hayne vs. Beauchamp, to see whether there is the slightest difference in effect between the two transactions. If I could assent to the reasoning of the majority of the Court in Hayne vs. Beauchamp, and did I believe that this Court would yield *its* assent to the position there taken, I would not hesitate to risk our case upon the entire similarity in point of legal effect, to that, and confine my argument entirely to the facts necessary to establish such identity; but confident as I am, that this Court will, as other Courts have, deem the dissenting opinion of Mr. Justice Clayton, in Hayne vs. Beauchamp, more satisfactory, as putting the decision on the true ground, I shall make no argument upon the evidence relating to the discount of the draft, and the check given for the proceeds in payment for the stock.

The first case decided in this country, in which any such doctrine as that put forth by the Court below, was ever declared, was that of Jenkins vs. the Union Turnpike Company, decided in the Court of Errors of the State of New York, First Caine's Cases in Error, 85. To this case all subsequent decisions of a similar character have referred for authority. It then becomes material to inquire what were the reasons given for that decision, in order to see whether they apply to this case.

The following passage from the opinion of Chancellor Lansing shows the grounds upon which the Court of Errors rested its judgment:

"The acts to be performed by the Commissioners were

merely preparatory to its creation. To give effect to their acts, their power must be strictly pursued. They had no discretion or latitude of action—their line of conduct was marked with the utmost precision. They were directed to exact from the persons who were to be admitted members of the corporation, both subscription and payment, as a condition precedent to their admission. If they omitted either to subscribe or pay, they did not come within the terms of admission. If so, the bare act of subscription was wholly nugatory. The subscribers who were to meet, could only constitute themselves such, within the intent of the statute, by a compliance with the terms prescribed by it. When the corporation was organized, the Directors might dispense with the exaction of the first payment."

" The power of the Commissioners was limited to a certain mode of receiving subscriptions. The power was to be strictly pursued, and they could not deviate from the requirements of the statute, and unless the requirements of the statute were pursued, there was no corporation created, and consequently no stock secured. If the contract is sought to be viewed as a promise to pay for the stock by the subscriber, in consideration of a promise to deliver the stock by the corporation, the answer is, that the contract of the subscriber is not binding, because there was no corporation in existence to be bound by the alleged agreement to deliver the stock, and consequently no consideration for the promise to pay for the subscription."

In all the subsequent cases, when similar questions arose in New York, the Courts invariably held that the case in 1st Caine, just quoted, was decided upon the ground stated by Lansing, Ch. See the cases of Goshen and Minnisink Turnpike Company vs. Hustin, 9 John. R., 218; Highland Turnpike Company vs. McKean, 10 John. R.,

154; Dutchess Manufacturing Company vs. Davis, 14 John. R., 238.

In the first case, the Court expressly limit the application of the case in 1 Caine to such subscriptions for stock as are made to corporations not *in esse*. The same distinction runs through all the New York cases.

The Supreme Court of Mississippi, in the case of Lewis vs. Roberts, in 558 of 13 Smedes and Marshall, in commenting upon the case of Hayne vs. Beauchamp, 5 ibid., 515, expressly confine that case to subscriptions for the first instalment for stock, and hold as they held in King vs. Elliott, 5 Smedes and Marshall, 428, that a note given for stock bought of a corporation *in esse*, was valid.

Having thus shown that the decisions relied on to support the decree, apply only to subscriptions made to corporations about to be formed, and that the reasons assigned for holding notes given for such subscriptions void, are the want of power, in the officer, to dispense with the requisition of the law, and the consequent want of consideration, &c., it seems to me that I have only to advert to the facts in this case, which show a *corporation already formed*, and a directory, competent to represent it, to convince the Court of the inapplicability of the cases I have been commenting upon to the one under discussion.

But I proceed to do more perhaps than is requisite, and. to prove that the weight of argument and authority is opposed *in toto* to the doctrine of those cases, and that they should not receive the approbation of this Court, because they are unsound in law, and lead to consequences not to be furthered by Courts of justice.

The question now before this Court, has been examined and decided in Vermont, in the case of the Central Railroad Company vs. Clayes, 21 Ver. R., 31.

The defence set up was, that the note was void, &c. The

Court says : " The note in suit was given for the first five dollars payable on each share, which, by the terms of the charter of incorporation, was to be paid to the commissioners at the time of subscription. This, it is said, cannot constitute a sufficient consideration to sustain the note, but we think otherwise."

By the terms of the charter, each subscriber becomes a stockholder and a member of the company, and the interest thereby acquired is a sufficient consideration to support an action for the amount subscribed against the person subscribing, upon an express promise, &c. The Court intimates an opinion that had the corporation been a bank, a different decision might have been made, and the rule in New York might have been adopted—but as this is but an intimation of an opinion, it decides nothing—I quote the case to show that the New York doctrine was disapproved.

The same question has arisen in Alabama, and has been before the Court in several cases, but was not decided until it came up in Selma and Tennessee Railroad vs. Rountree, 7 Ala. R., 670, where the cases in New York are reviewed. The Supreme Court of Alabama refuses its concurrence with the doctrine of the Court of Errors of New York, as declared in Union T. Company vs. Jenkins, in 1 Caine's Cases, 85, but approves and adopts the decision of the Supreme Court of that State in the same case. The Alabama Supreme Court also indicate an opinion that a difference exists between a monied corporation and a Railroad Company, and refers to the charter of two of their own banks. But an examination of them will show that the payment of the first instalment is made a condition precedent to their existence. In such case, no doubt, were no money paid there would be no corporation.

The same question was raised and decided in Ohio, in

the case of Henry, *et al.* vs. Vamilla and A. R. R. Company, 17 Ohio, 190. In this case, the defence set up was the failure to pay in specie the first instalment, and a contract to pay in goods. The Court says : " Although the stockholders were required to pay at the time of subscribing, five dollars on each share subscribed, still in the opinion of the Court, the omission to pay that sum does not release them from their liability to pay up their subscription." The case in New York and similar ones in Pennsylvania, were cited by the defendants.

The Supreme Court of Massachusetts have also had under their consideration, the question, in the case of Chester Glass Company vs. Dewey, 16 Mass., 94. They held in opposition to the Court of Errors of New York, that a subscription similar to that in Union T. Company vs. Jenkins, was valid.

In Minor vs. Mechanic's Bank of Alexandria, 1 Peters, 46, a defence offered to be set up that the mode in which the stock was allotted was in conflict with the charter, was not deemed sufficient by the Court to release the party from his subscription.

I have thus far treated the subject in an abstract point of view, and without any reference to the peculiar features of the charter of the Southern Life Insurance and Trust Company. I now wish to show that the contract between the subscriber for stock and the Company, was a compliance in effect with the spirit of the charter.

By the sixth section of the charter, the company was required to loan its capital on bond and mortgage, but by the amendatory act of 1838, section 4, permission was given to use two-fifths for banking purposes.

It must be observed, that this company was not, in its original creation, purposed to be either wholly or for the most part, a banking concern. The legislature did not

evince any desire to have the capital stock all paid into the hands of the directors, there to remain, but on the contray, expressly required the directors *not* to retain it on hand.  Bonds and mortgages, and not specie, was what the legislature designed should constitute the fund or indemnity against loss to which depositers and others must trust.  This being made manifest, the policy which the defence sets up and assumes to have been violated, never existed at all under the first charter, but by express enactment—not vague inference—the legislature forbid the accumulation of the capital in specie, or its representation.  Hence, all the cases quoted which hold the subscription for stock in a bank not paid in specie to be void, because of the policy asserted to exist in relation to banks generally, to wit: the payment of specie for stock, did not apply to this company in its original organization.  The Supreme Court of Mississippi, in the case of Hayne vs. Beauchamp, and the Court below in this case, hold that the legislature, in requiring that specie alone should be paid for stock, manifested an intention to provide that the bank should have its capital paid in and to be in hand in specie, to provide a fund for the redemption of its circulation.  If I am correct in the view which I have taken, that the legislature in the creation of this corporation, manifested the opposite intention, then this case differs *toto coelo* from those relied on by the other side, and the reasons given in those cases, and those advanced by the Judge who decided this case, are inapplicable, and therefore do not support the decision.

Nor does the fact that the legislature, in the amendatory act of 1838, section 4, gave the *power* to use two-fifths of their capital for banking, change the legal aspect of the contract.  If it had any application which could bring it within the reason of the cases in New York and Mississip-

18

pi, it could only do so as to the two-fifths, and no more. But the legislature does not peremptorily repeal the former law and absolutely require two-fifths to be used for banking; it gives the company the privilege of so doing, to be used or not, at the option of the directors—and if they see fit not to do so, they could act in conformity with the former requirements of the charter.

The legislature then, having not only permitted but required the capital paid in to be borrowed on bond and mortgage, having by express provision sanctioned such an investment of it, no act of the stockholders, or of the directors, not conflicting with the law, can be pronounced invalid—but any act which, in its operation and legal effect, secures the end desired to be attained, and effects the intention, is valid for all purposes, upon the most obvious principles of reason and common sense.

One of the fixed rules of construction in relation to corporations, is : " that all acts of incorporation are held to be directory unless they expressly avoid all security taken other than that prescribed, and that although neglect of this kind may be culpable on the part of directors of the Company, the security taken may be enforced against him. who gave it." Angell & Ames, Corp., 190.

In Little vs. O'Brien, 9 Mass., 423, the case was this— " the charter required the capital should be invested in certain stocks ; whereas, instead, the company took the notes of the stockholders with collateral security. It was said by the Court, that whether for this misbehaviour of the corporation the Government might not serve their franchises upon due process, was a question not before them, but that it did not lie in the mouth of a stockholder for this cause to avoid his contract, which, as between him and the company, was made upon a sufficient consideration."

The same principal is maintained in the case of Chester Glass Co. vs. Dewy, before cited.

In the case of the Bank vs. Hammond, 1 Richardson's Law Rep., 288, which was a suit upon a note for a large sum, and secured by a different kind of security than that prescribed by the charter, the Supreme Court say : " It is, however, too strict to insist that a power which is contained in a grant, and which, *in various ways*, may be *pertinent* to the *purposes* of a corporation, may be restricted to a particular *form* of directions for its exercise in *that form.*"

In Bates vs. Hines, 2 Ala. Rep., 451, in which a question arose as to the validity of a contract made with a Bank, and said to have been in violation of certain provisions of its charter—the Court say : " Be the rule of construction in this class of cases ever so strict, it must be admitted that in most if not every act of incorporation, while certain rules are prescribed which cannot be transcended, and the observance of which are essential to the validity of its contracts, there are others which are merely directory to the officers of the corporation, and the observance of which is not necessary to the validity of contracts made in reference to them." The following cases are cited by the Court to sustain this proposition :

Commissioners, &c., vs. Leckie, 6 S. & R., 166 ; Bank N. Liberties vs. Cresson, 12 Ibid., 306 ; Bank U. S. vs. Dandridge, 12 Wheat., 64 ; Bulkly vs. Fishing Co., 2 Conn., 252.

In the case of Bates vs. Hines, just referred to, the Court says : " The reason of the restraint was to guard the Bank against loss." " It was doubtless expected by the legislature that its commands would be obeyed by its agents, but *it is impossible to suppose* that it was *ever contemplated* as the result of a *regulation* intended to *protect the public*

against loss, that if by collusion with the directors (or as was doubtless the fact in this case, an honest mistake on the part of the directors) an individual could succeed in getting, on a bill of exchange, a larger sum than the charter allowed, that the *same regulation* would *protect him* against *paying* it. Whatever may be the liability of the directors in such a case, the *borrower must return the money*. Any other construction would place the capital of the bank at the mercy of a venal directory and profligate borrower."

To the same effect is the case of Bond vs. Central Bank, 2 Kelly, 92. See also 9 Ala., 853.

By the sixth section of the original charter of the Bank, it was required that its capital stock should be invested in bond and mortgage, as before remarked. In the transaction with Lanier, the corporation carried out the intention but not in the particular mode which the defence insists should have been adopted. It is contended that Lanier should have paid specie for his stock; but of course it is not denied but that had he done so, the Bank could have immediately loaned him the very money he paid in, provided he furnished the kind of security the charter stipulated would be obtained. I think the counsel for the defence will find it difficult to prove that taking the bond and mortgage for the stock in the first instance, essentially varied the effect of the transaction, or that such mode of investing the capital militated in any way whatever against the end desired to be secured by the sixth section of the first act of incorporation; as to the mode in which the object was effected, the provisions in the charter are clearly directory in their character, and the failure to pursue the order of proceeding pointed out in the law, no more renders the acts done illegal and void, than the more essential deviations which existed in the cases just cited in Alabama,

South Carolina, Georgia, Massachusetts, &c. In those cases, the acts done were in contravention of the charter. In this case, the sale of the stock and the security taken, fully realized the intention of the legislature. No law was violated—no policy frustrated, no one was injured.

But independent of the reason which I have adduced to show that the act was valid and in conformity with the spirit of the charter of the corporation, I beg leave further to refer to the acts of incorporation and the amendatory laws, for the purpose of showing, as I think I can do, beyond a reasonable doubt, that the directions in the 9th, 10th, 11th, and 12th sections of the first act of incorporation do not apply to the sale of the surrendered stock—conceding for the sake of argument, all the conclusions deduced from the provisions of said sections by the defendant's counsel.

The sections referred to, provide for Commissioners to receive subscription—that the books shall be kept open at particular places, and that when the stock is subscribed for, and a certain sum paid in cash, that the Governor shall issue his proclamation, &c. These are the usual restrictions and limitations imposed by the legislature in the creation of a monied corporation. They provide for the mode and manner of the *creation*, and when these conditions precedent are complied with, and proclamation made, the corporation exists.

It must be admitted that the third section of the act of 1838, in giving to the Company the right to re-issue the surrendered stock, is entirely silent as to the mode and manner in which the same shall be done. The grant of the power to accept the surrender of the shares subscribed and to re-issue them, is unlimited and unrestrictive. But the defendant contends that the limitations and restrictions contained in the 9th, 10th, 11th, and 12th sections of the

original act, are by implication, enjoined in the amendment. It is an unusual doctrine, that a grant, in itself free and unfettered, should receive a construction affixing restrictions of any kind, but such position is the more untenable when sought to be sustained by reference to a previous act imposing such restriction—which act is not prospective as to any amendments which may be made, and which by its terms and context evidently was intended to have relation to acts passed and performed, and which restraining act is not referred to in the grant—but particularly when, as in this case, the restrictions and limitations of the first law could not be made to apply to the exercise of granted power, without supposing that the legislature demanded that to be done which would be manifestly absurd as well as inconsistent and impossible.

If any part of the directions contained in the 9th, 10th, 11th, and 12th sections of the original charter apply to the grant made in the third section of the amended act of incorporation of 1838, and are conditions upon which alone the grant can be enjoyed, then every condition and limitation in the sections cited applies. I know of no rule by which a part can be referred to and the balance rejected. If this be true, I ask the Court to consider the absurdities which would result should such reasoning be carried out. It would suppose the legislature to have required that the corporation which was in existence, with a large capital paid in, and in the pursuit of its lawful business, should go through the same initiatory steps which had been provided for its formation, leaving nothing to the discretion of its directors or the judgment of its stockholders, whose interests would be most affected by any false step. Is it within the bounds of reason, that the legislature should have required that new books should be opened, commissioners appointed, and after a certain time, and on the pay-

ment of a certain sum, proclamation made by the Governor, &c., &c., before the corporation could sell a share of its stock? Where is any reference to the appointment of such commissioners, or to the proclamation by the Governor? Or what reason is there to suppose that any such requirement was intended? The counsel for defence will say with me, I think, that there is no ground to contend that any such proceedings were enjoined. Where, then, I ask, do they find the rule that is to govern the Court in deciding which of the limitations and restrictions in the original charter is applicable, and which is not? The argument used on the other side, if it should prevail, would launch the Court into a sea of conjecture, without any fixed rule to govern it. Again—the 12th section of the original act provides that no more than ten per cent. shall be required at the time of subscribing, and that additional instalments may be called for within fixed periods, and that the whole amount shall be paid in a certain time. Now, suppose this to be applicable to the re-issued stock. If such had been the case, the persons subscribing for it would be entitled (by paying ten per cent.,) to enjoy the same rights and privileges, and to the same extent, as the same were had and possessed by the stockholders who had paid for their stock in cash in full. Is it to be supposed that such gross inequality was ever contemplated by the Legislature?

The slightest examination of the two acts referred to will suffice to convince the understanding of any man of common sense that they are inconsistent one with the other, and have no material dependence; and even if the first act had been referred to by the last, no Court could have reconciled them—still less will a Court find a reference where none can exist, or construe a grant so as to subject it to limitations utterly inapplicable, upon bare surmise of an

intention, without any expression in the law making the grant referring to the act containing the limitation. I maintain that no power exists by which such a construction can be made. The mere belief that the Legislature favored such a policy as that contended for, because they had provided certain limitations in the first grant, would not justify the Court in imposing similar limitations upon the second, when the Legislature itself had not so provided. To do so, would be to materially alter the contract, and render it less valuable, and amount to a violation of its obligation.

If, then, the provisions of the first act are inapplicable to the sale of the surrendered stock, or even if the whole, or any part, is applicable, yet, if the Court should agree with me, that by the amended act giving power to the corporation to accept a surrender, and make sale of the stock, no limitation and no condition are imposed, in either aspect of the case, there is no ground for the defence set up, as to the legality of the sale to rest upon.

But even granting the mode in which the sale of stock was made to be illegal and violative of the policy indicated in the charter, yet I contend that the defendant cannot escape from paying his bond. He has assumed to act and has acted as a stockholder; he has received all the benefits of the contract, and should he be released from liability, he will enjoy the fruits of his illegal act; and the creditors of the corporation, the persons designed to be protected by the Legislature, are saddled with the loss. The observations of the Supreme Court of Alabama, in disposing of a defence similar to that set up in this case, are here peculiarly appropriate, and although before quoted in the argument, I again cite them : "It is impossible to suppose," say the Court, "that it was contemplated as the *result of a regulation intended to protect the public against loss,*

that if, by collusion with the directors, &c., an individual could succeed in getting on a bill of exchange a larger sum than the charter allowed, *that the same regulation would protect him against paying it.*" By the decision made in the Court below, the regulation said to exist, and alleged to have been " *intended to protect the public against loss,*" is made to produce the very result deprecated, and " *the same regulation protects him* (Lanier) *against paying.*" This kind of reasoning, which justifies and supports such a decision, is that which disregards the *spirit and reason of the law,* and adheres to the " *letter which killeth.*" To such judgments may the maxim " *qui hæret in litera, hæret in cortice*" be applied.

There is a numerous class of cases of a kindred nature with that before the Court, some of which have been cited in another branch of the argument, in all of which it has been held that the defence set up by Lanier is untenable, and the reasons given have been that the party, having obtained the stock and having held himself out to the world as a stockholder, was estopped to deny his character as such, and could not plead his own illegality to avoid the contract. And particularly has this been decided when the corporation had become insolvent, and the suit has been for the benefit of creditors.

The following authorities are to this part of the argument:—5 Alaba. R., 787; 17 Ohio, 190; 19 Ibid, 463; 16 Mass., 94; 9 Ibid, 423; 21 Vermont, 31; 20 Conn., 170; 14 Wendell, 20; 6 Hill, 624; 1 Hall S. C.; 2 Barbour S. C., 294; 7 Alab., 670.

The complainant is admitted to be insolvent. It has been held, in a variety of cases, that when a corporation becomes insolvent, the officers are trustees for the creditors, and that it is their duty to collect the debts due to the corporation, and pay those due by it. This being the law,

19

the suit before the Court can only be viewed as a proceeding instituted for the benefit of creditors, and the decisions last quoted apply with full force to the case. See Wood vs. Dummer, 3 Mason C. C. R., 308. It is all the same as though the suit had been brought by one creditor in behalf of himself and other creditors.

SEMMES, J.:

This was a suit in Chancery, commenced in the name of the Southern Life Insurance and Trust Company and the State of Florida, against A. H. Lanier.

The preliminary question made in argument, and raised by the answer of respondent, is that the State of Florida has no interest in the suit, and that, therefore, the bill should be dismissed. The objection is presented by special matter, set up in the answer by way of demurrer, under the provisions of our statute law. Thomp. Dig., 458, § 9.

We do not doubt the correctness of the doctrine, or its application to this case, that, to sustain the character of a plaintiff, it is requsite to show in him an interest, either legal or equitable, in the subject matter of the suit. The principal facts stated in the bill, and relied on in support of the interest of the State, is, that by reason of certain liabilities incurred by the late Territory of Florida for this Company, under the authority of its charter, the bond and mortgage of respondent were deposited with the Governor of the Territory, to indemnify it against loss ; and that, upon the filing of the bill, the said bond and mortgage (which had been previously turned over to the Governor of the State,) was held by him in trust, and as a security for the ultimate payment and redemption of the liabilities of said Territory ; and that the suit was brought at the instance of said Governor, for and in behalf of said State. It is a mis-

conception of the term to say that these allegations, or any of them, are inferences of law. They are stated and relied on as matters of fact, and are all admitted by the demurrer to be true.

Whether the State of Florida has, in any mode or form, incurred any liability in respect to this matter, is not a question for our consideration; nor do we so decide, or even intimate an opinion. In fact, as far as concerns the question before us, it is not necessary that there should have existed the remotest *liability* on the part of the State to authorize its being made a party to the suit; for if, upon the organization of the State Government, this bond and mortgage were delivered to the executive, and he as such held them *in trust*, as a security and means of indemnity for another party, it was both proper and necessary that the State should have been made a complainant. It would seem scarcely necessary to refer to the manifest distinction between the case before us and the cases of the King of Spain vs. Machado, 4 Russ., 225; Cuff vs. Platell, *ibid*, 242, and other authorities to the same effect. In these cases, the entire want of interest on the part of some of the complainants, appeared on *the face of the bill*, and the demurrer was of course sustained by the Court. In the case of Makepeace vs. Haythorne, 4 Russ., 244, the objection did not appear on the face of the bill, but was raised by plea. In these cases the Court, in affirmation of the well settled doctrine on this subject, say that if a party has no interest in the suit, the bill is demurrable, if that fact appears on the bill; but if the fact does not appear on the bill, but is brought forward by plea, it is a good defence to the suit. The principles announced by the Court in these authorities, are directly adverse to the argument of respondent's counsel.

But independent of these views, a fatal objection to this

demurrer is, that it is a speaking one. 1 Story's Eq. Pl., 495. It alleges, in aid of itself, that the Territory of Florida in the first instance was not liable on its guarantee ; that the State is not the successor of the Territory as to any liabilities incurred by the latter ; that the bond and mortgage were not assigned to the State as a security ; and that the Governor had no authority to institute suit without the authority of the General Assembly, who alone had power to enter into agreements recognizing the liability of the State ; and that the late Territory, through its Legislature, has, by repeated action, declared said guaranties null and void. All these facts may undoubtedly be true, but it was not the office of the demurrer to set them up in its support. The very attempt to do so is fatal to the demurrer. Being matters *dehors* the bill, they could only be raised by plea in order to be available. But the argument of counsel in support of his demurrer proves too much ; for if it be true, as the answer states, that the State was made a party without due authority, then the rule of practice is of peculiar application, that where a person is made a co-plaintiff improperly, without his privity or consent, the proper motion is that his name be stricken out, not that the bill be dismissed even as to him.

The respondent has, at this stage of the case, no cause of complaint. Our statute, which allows a defendant to set up special matter in his answer, and claim the same benefit he would be entitled to if he had demurred to the bill, is but an affirmance of the rule of Chancery practice, as recognized by the English Courts ; and the construction given by those Courts to this rule is, *that only at the hearing of the cause* such benefit can be insisted on, except in the case of multifariousness or *misjoinder*, in which case, if the defendant does not take the objection *in limine*, the Court, considering the mischief as already incur-

red, will not, except in a special case, allow it to prevail *at the hearing.* 2 Dan. Ch. Pr., Amer, Ed., 819, and authorities cited.

If the respondent, as was his duty, had presented this point *in limine*, the objection might have been corrected without prejudice to the rights of the Company. Omitting to do so, and going into the merits of the case, he waived his demurrer; for it would be against every rule of propriety to allow a defendant to call upon a Court for a decree on the merits, and if against him, to fall back upon his demurrer, and invoke the judgment of the Court upon that. And to this extent does the argument of counsel lead us. Its effect would be to mislead opposing counsel, and embarrass the Court in the discharge of its duty. We feel no hesitancy in saying that a defendant should never be allowed, by such a device, to spring upon his adversary in the appellate tribunal, an objection he did not urge in the Court below, but by his course, induced both the Judge and counsel to suppose he had waived the objection. We know of no rule of Chancery practice which would authorize such a proceeding, and we feel no disposition to establish one.

We now proceed to the consideration of the merits of this suit; and, in view of the magnitude of the interest at stake, and with an anxious desire of settling correctly the principles involved, we have bestowed all the time at the disposal of the Court to the consideration of the subject, aided as we have been by the very able and elaborate investigation made by counsel.

The Bank was organized and went into operation in 1835. In 1839, the Company re-issued stock, which had been surrendered, under the provisions of the amendatory act of 1838, and the respondent, Lanier, became the purchaser of one hundred shares, for the payment of which he executed

his bond and mortgage to secure the sum of $10,000. Some short time thereafter, in right of his being a stockholder, and upon the faith of his shares of stock, he borrowed from the bank the several sums of $6,000 and $917, for which he gave his notes. The bill is brought to foreclose the mortgage and recover the amounts due on the bond and notes.

Upon the part of the respondent, it is contended that the bond and mortgage were given without consideration, and that they are illegal and void,

*First*—Because the surrendered stock was issued by the Company contrary to the mode prescribed by the charter ;

*Secondly*—The capital stock of the bank could not be sold for bonds and mortgages ;

*And thirdly*—The respondent was induced to execute and deliver to the Company his bond and mortgage by the fraudulent representations of its agent.

No defence is urged against the payment of the notes for $6,917, further than that the amount borrowed was not specie or its equivalent, but bills of the bank, which it is alleged were at a discount.

The last point does not require consideration, for whether the fact be as stated or not, it cannot affect the liability of Lanier, or the validity of the contract. There was nothing illegal about the transaction. It was a voluntary act upon his part to receive bank bills and execute his notes payable in *money*.

To sustain the first position, it is insisted that the Commissioner and not the Company should have issued the surrendered stock, and that ten per cent. was requisite to be paid on each share, at the time of purchase, to make valid the transfer of stock. We find nothing in the charter, nor are we aware of any rule of construction which would warrant such a conclusion.

First, as to the ten per cent. : The capital stock of the

bank consisted of two millions of dollars. The Commissioners were directed in the first instance to open books to receive subscriptions to this stock, and it was required that ten per cent. should be paid to the Commissioners on each share, at the time of subscribing. So soon as all the capital stock was taken, and $200,000 was paid in, trustees were to be elected, the Governor to be notified of the fact, and, upon his proclamation, the Company became fully organized, and was authorized to commence business. All this it is conceded was done. Upon the payment of $200,000, which was the first instalment of the capital stock, the sole object of requiring the ten per cent. was fully accomplished, and the Company became at once invested with all the acts and powers secured to it by the act of incorpotion.

With the view of aiding all subscribers, and relieving them from the penalty of a forfeiture of their stock, imposed by the tenth section of the original act, the Legislature, in 1838, by an amendment of the charter, authorized the Company, in its discretion, to allow any stockholder to surrender his certificate of capital stock, and take a certificate of full stock equal to the amount of payment on the stock so surrendered, and the Company were to hold or re-issue such overplus stock. Upon what reason or authority can it be contended that the Company were compelled to require of the purchasers of this surrendered stock a payment of ten dollars on each share of their purchase? It is not pretended that there is any provision in the act authorizing a surrender and re-issue which requires it. But it is said the terms of the original charter are broad and comprehensive, including *all* subscribers. This is true; but still it has exclusive reference to the subscribers before the corporation was organized, and before it had existence. The ten per cent. was required to be paid as a condition

precedent to its existence, and it was paid by all the subscribers, in literal compliance with the charter. There was no discretion in the Commissioners, who were but the agents of the government, clothed with a special trust. Their duty was imperative and well defined, and no subscription could be valid without this pre-requisite. So soon as the $200,000 was paid in, the duties of the Commissioners in reference to the original subscribers ceased, and the special requirements of this part of the charter had been accomplished. The object and reason of the rule ceasing, why revive it, and force its application to the exercise of unrestricted authority, in the Company's re-issuing its surrendered stock, when, too, the ten per cent. had been paid upon this identical stock, by the original subscribers, before the surrender, and which was in the vaults of the bank?

The question presented on this branch of the case is not a new one. In the leading case of Jenkins vs. The Union Turnpike Company, 1 Caine's Cas. in Error, 85, Chancellor Lansing places the doctrine, in our opinion, upon the true ground—that the power of the Commissioners was restricted to a certain mode of receiving subscriptions. The acts to be performed by them were preparatory to the cretion of the corporation. They had no discretion or latitude of action, and to give effect to their acts, in receiving subscriptions and exacting payments, the mode prescribed must be strictly pursued ; otherwise, there would be no contract with the subscribers, because there was no corporation to deliver the stock, and consequently no consideration. But when the corporation was in existence, the directors might dispense with the exaction of the first payment. The same well founded distinction between subscription for stock to Commissioners, preparatory to the organization of the corporation, and to a corporation *in esse*, is fully recognized

by all the New York decisions. Vide 19 John. R., 218; 10 John R., 154; 14 John .R., 238. See also, Lewis vs. Roberts, 13 Smede & Mar., 558; King vs. Elliot, 5 Smede & Mar., 428. Even this principle, in many cases, has been considered too rigid in its application, and it has been modified by the decisions of other States. In fact, there would seem to exist no good reason for holding a contract for subscription to stock to be illegal, because the payment in cash of the first instalment was not exacted, unless a cash capital was requisite, as in the case of a banking institution, or where, by the terms of the charter, it is made a condition precedent. See Vt. Central R. R. Co. vs. Clayes, 21 Ver. R., 31; Selma and T. R. R. vs. Rountree, 7 Ala. R., 670; Henry et al. vs. Vamilia and A. R. R. Co., 17 Ohio R., 190; Chester Glass Co. vs. Dewy, 16 Mass. R., 94; Minor vs. Mechanic Bank of A., 1 Peters, 46. The effect of these authorities is sought to be evaded in the argument, by contending that this institution was not authorized to do a banking business until the amendatory act of 1838. If this were true, it would in no aspect of the case affect the merits of the question we are considering. The fourth section of the act authorizes the Company to use two-fifths of the capital stock paid in, or which may thereafter be paid in, for ordinary banking purposes. It was an additional grant to the Company, not impairing or restricting its previous powers, and it was optionary on the part of the directors to use two-fifths of the capital at that time paid in, for banking purposes, without calling in any further instalments for that purpose, or not avail itself of the right at all, but continue in the full exercise of its original powers, in investing its capital stock in bonds and mortgages. But it is not true that this corporation had not banking powers previous to the act of 1838. By the 19th section of the original act, it had the right to issue bills to
20

154        SUPREME COURT

So. Life Ins. & Trust Co. vs. Lanier.—Opinion of Court.

the amount of the capital actually paid in. It had the additional right of receiving funds on deposit, and to discount and purchase promissory notes and bills of exchange. These powers constitute all the elements of banking, as understood in this country. See the case of the Bank of Augusta vs. Earl, Peters S. C. R.

It is further insisted that the Commissioners and not the Company should have re-issued the surrendered stock. A conclusive answer to this is, that in the case of subscription to stock in the first instance, and in the case of forfeited stock, the Commissioners were required to open books for subscription—in the first case by express terms, and in the latter by implication—while in the case of surrendered stock, the corporation itself was authorized "*to hold or re-issue it.*" The grant of power to the Company to accept the surrender and re-issue the stock, is as well-defined and unrestricted as language can make it; and unless it can be shown that the Commissioners and the body corporate are one and the same, there is no foundation for the argument. The question is not, as is supposed, whether there is in fact any distinction in the stock itself when forfeited or surrendered, but whether the charter has not expressly defined the grant, by providing that the Commissioners shall offer the one for subscription, and the Company re-issue the other.

If it be true that the forfeited stock could only be subscribed for through the Commissioners, it was a wise provision of the act of 1838 which gave to the Company this right of re-issuing its surrendered stock, and it was doubtless designed to remedy the evil of the old law, by providing against any contingency which might prevent the Commissioners from being present at all times to open books for subscription. By the 9th section of the original charter, three persons, by name, were appointed Commissioners.

After they had performed the duty assigned them, preparatory to the Company's being organized, who were to act for them in case of their death or absence? No provision is made for supplying their place or appointing new ones. Was it in the contemplation of the Legislature that these three persons should, under all the changes of life, be present at all times, to dispose of the surrendered stock, during the fifty years' existence of the corporation? Or does not the new law, in providing a remedy, fully meet the mischief?

The next objection taken by the respondent is, that the surrendered stock could not be sold for bonds and mortgages; and a similar course of reasoning is adopted to sustain this position as the first, but it is equally artificial and untenable.

By the sixth section of the original act, the corporation was required to loan its entire capital of two millions upon bonds and mortgages. One of the leading objects contemplated by the law, was to invest the proceeds of the sale of stock in this kind of security; a fund permanent and secure, yielding interest, and to which the creditors of the bank could look as a security for the ultimate payment of its liabilities. Not only the $200,000 paid in was to be invested in these securities, but all subsequent instalments, so that, if money was paid for stock, it was to be at once converted into bonds and mortgages. After the bank was *in esse*, it was an unmeaning and idle ceremony to require payments in cash, and then invest the latter in bonds and mortgages. In the absence of all positive inhibition by the law, what objection could be raised to investing the stock in the first instance in this security? The same purpose is effected by one instead of a double operation, and no sensible distinction between them can be conceived. But it is said " that it is not the *stock* which is to be invest-

ed in bonds and mortgages, but the *capital*." But where exists the distinction? The stock represents the capital, whether in money or bonds and mortgages. The stockholder's certificate of stock is evidence of the interest he has in the capital, and nothing more. Whatever amount he has contributed to the general fund, whether in money or bonds and mortgages, his interest in the capital is the same. In investing the stock, you invest the capital of the bank.

No mode is pointed out as to re-issuing this surrendered stock. But it belonged to the Company, and they could dispose of it in any mode not inconsistent with their general powers. They could sell it at public or private sale, for cash or on a credit. They had as much power as to its disposition as though it had been hypothecated to the Company, and been forfeited by the terms of the hypothecation.

It is evident that, if the construction given to the act of 1838 is to prevail, then, by some process unknown to us, the entire provisions of the old law become incorporated in the new. For the same rule of construction that would apply one provision must apply all, and the same mode and formalities are to be observed in re-issuing the surrendered stock as before the organization of the Company. The board of Commissioners are to be revived, if they are in life; if not, the stock is to remain fruitless and dead upon the hands of the Company. The ten per cent. is to be paid and the residue is to be sold, not on a credit for bonds and mortgages, but to remain payable in instalments, in such amounts and at such times as the trustees may direct. Thus, instead of conferring on the Company an additional franchise, and amending the old law, as it purported to do, it but re-enacted (and all by intendment,) its entire provisions.

There is a manifest difference between the original sub-scribers and the purchasers of the re-issued stock.   The former could surrender their shares and take a certificate for full stock.   The latter could not, even with the assent of the directors, have discharged their liability by a surrender, for it would have been a fraud upon the creditors. Nor could the bank have compelled a forfeiture of their stock.   Independent of this, in what possible mode were the dividends to be made to the stockholders?   The first class hold certificates for full stock, the whole amount paid, while the purchasers of the re-issued stock are to pay but ten per cent. on their purchase.   Are the latter entitled to the same dividends as the former?   Or are two distinct classes of stockholders to exist in the same Company, with distinct rights and privileges, depending upon no fixed rule, but subject to constant change and modification, by the amount of instalments which each may pay on his stock?

The two acts are entirely independent of and inconsistent with each other, and no rule of construction can reconcile them.   The first is a restriction as to the mode and manner of disposing of stock, with the object and purpose clearly defined; the latter is an unconditional grant of power, *only restrained by the general object and policy of the law.*   The principle cannot be questioned, that where a grant of power is clearly defined, and no mode is prescribed for its exercise, it is for the corporation to adopt such mode as in its judgment will secure the purpose contemplated.   And so well recognized is this doctrine, that as a general rule a grant specifying the mode and manner of exercising powers, is construed as merely directory, unless there are negative words, excluding the right to adopt any other mode; and restrictions upon grants of power, designed for the protection of creditors, are not to be con-

strued to defeat that purpose. The charter of this bank, by the twenty-sixth section; is to receive from the Courts " a favorable construction ;" but so far from the one given it being consistent with the object of its creation, it defeats both the reason and the spirit of its provisions, by embarrassing the corporation in the exercise of clear and well-defined powers.

But it is said the respondent was induced to become a stockholder by reason of the fraudulent representations of the Bank or its agent; and numerous familiar elementary principles, as to fraud and illegality, have been invoked and zealously pressed upon the Court. But their application to this case is entirely misconceived. The matter of fraud, in the first instance, is a mere question of fact, and we have in vain searched the record before us for evidence to sustain it. It is said the Bank was insolvent in 1839, when Lanier purchased his stock. The proof is, that, though embarrassed, it was solvent in 1840, and paying specie; and that this embarrassment and final insolvency were mainly occasioned by the want of good faith upon the part of the stockholders, to meet their liabilities. And if Lanier has failed to realize all the advantages which he seems to have expected, on becoming a stockholder, it should be recollected that he has contributed to produce the very state of things of which he now complains. The loose conjectures of witnesses, as to the condition of the Bank in 1839, based upon no knowledge of their own, but derived from others who had as little means of information, could have but little weight under any circumstances, but especially when contradicted by the then officers of the institution. There is no evidence that the agent ever made to the respondent any representations as to the solvency of the Bank, or as to any other matter upon which he rests the question of fraud. But conceding the fact to be as al-

leged, it was his duty, upon a discovery of the fraud, to have taken immediate steps for the rescision of his contract. Story's Eq. Jur. § 190–1–2–3–5.

According to his own statement, he first discovered the alleged fraud when he applied to the Bank for the loan of the $6,917 on the pledge of his stock, which he received in bills of the Bank, and for aught that is known, used as money. Afterwards we find him renewing his notes for this amount, from time to time, without objection and without complaint; holding himself out as a *bona fide* stockholder from 1839 until the filing of his answer to this bill; giving faith and credit to the institution as such stockholder, and enjoying all the advantages 'of such a relation. Were the facts true, his defence has no foundation in law or morals. By his repeated ratification of the acts of which he complains, and to which he was a willing party, he is forever estopped from setting up such a defence, especially when the assets of the Bank would thereby be diminished, and the rights of creditors sacrificed. The means devised by the law to protect the public against loss, cannot be invoked to consummate the evil it was designed to avoid, by releasing him from a contract, the fruits of which he has already enjoyed.

There is one other matter to which, in our opinion, undue importance has been given, yet in consequence of its having contributed mainly to a difference of opinion among the members of the Court, we feel bound to notice. It is said the fifth section of the amendatory act of 1838, which provides 'that the company may call in the residue of its capital stock at any time within the period of five years from January, 1839, restrains, by implication, the power of the company from re-issuing any of its surrendered stock, after that time; that, as a consequence, the company, in the sale of this surrendered stock, had no authority

to extend the time of payment beyond that period; and that the credit given to Lanier for five years from July, 1839, was in violation of the charter, and the contract of sale and purchase therefore void. By what process of reasoning all this is arrived at, we are at a loss to conceive. Were the premises true, it would be no difficult matter to show, from principle and authority, that the extension of time did not affect the validity of the sale, and that it does not lie in the mouth of Lanier, for this cause, to avoid his contract, which, as between him and the company, was founded upon a good and sufficient consideration. But the positions assumed are not warranted by any fair construction of the charter, and cannot be sustained.

If reference is had to the 12th section of the original act of incorporation, and the amendatory acts of 1836 and 1837, in connection with the 5th section of the act of 1838, it is evident that the latter, in authorizing the company to " call in the *residue* of its capital stock," has exclusive reference to the stock originally subscribed for, and the payments for which were due and *then* outstanding. To make the whole charter consistent with itself, these several sections, treating of the same subject matter, should be construed in reference to each other. By the 12th section of the original act, the subscribers to stock were required to pay ten per cent. in cash on each share; ten per cent. at the expiration of six months thereafter, and the " whole amount remaining due" was liable to be called in by the Trustees at any time within three years from the date of subscription. The shares of every stockholder omitting to make such payment, within the time prescribed, became forfeited, together with all previous payments made thereon. The amendatory acts of the two following years authorized the company to extend these payments—the second instalment from six months to three years, and the

residue from three to five years from the time of subscribing. This gave the stockholders until some time in 1840 to pay up the remaining instalments then due. The act of 1838 authorized the Company to extend a further indulgence of five years, from January, 1839. It provides for the calling in, at any time within a limited period, the residue of its capital stock—that is, the amount then remaining due, and which represented the capital stock subscribed for. All the capital stock of the bank had been taken, and the instalments liable, as we have seen, to be called in at any time by the trustees, but who could, in their discretion, postpone the payment to the time designated by the act of 1838. How is it possible to extend the provisions of this act to stock which, after the passage of the law, might be surrendered to and re-issued by the Company, under a new grant of power? The re-issued stock is not subscribed for as was required in the sale of stock in the first instance. The latter was payable in instalments, at the pleasure of the trustees, and subject at any moment to forfeiture. But upon the Company's accepting a surrender of stock, under the act of 1838, it could hold or re-issue it, in any mode it deemed proper, consistent with the leading objects of the charter. The sale of this stock to Lanier, for his bond and mortgage, was not subject to the payment of instalments, to be called in at the pleasure of the Company, but it was absolute and unconditional. The contract of sale and purchase was complete, the purchaser holding a full and perfect title to the stock, subject to no recall, no forfeiture or conditions.

It must result from the argument, which assumes that the contract of sale was illegal, because the credit given to Lanier was more than five years from January, 1839, that had the credit been within five years it would have been legal. Suppose it to have been so, and that Lanier, on pur-

21

chasing his shares, had paid in cash the ten per cent., and given his bond and mortgage for the residue, payable in four years. Could the Company have recalled in this stock, or, in other words, have enforced the payment of this bond, which represented the stock, before its maturity? If the argument be true, the Company could, under this fifth section, exercise its unquestionable power of calling in the stock at any time within five years, by enforcing payment of the bond, at any moment after it was executed. The very absurdity to which the argument leads us, is a sufficient answer to its soundness.

Again—Suppose this surrendered stock had been sold to Lanier for cash, and immediately the Company had loaned the same to him on his bond and mortgage, for five years, or less time—these securities still represented the identical stock held by Lanier, and the position of the parties would, in legal contemplation, be altogether the same as now. Could the bank call in this stock before the maturity of the bond? Why not, if it has the power claimed for it under the fifth section? Is its power become suddenly paralized by simply entering into a contract which it is conceded would be a legitimate and legal one, under the provisions of its charter? The entire argument is necessarily based upon the hypothesis that although the bank has ample power to dispose of its surrendered stock, yet, under the same law which clothes it with this power, it can make no contract for its sale which it cannot enforce *at any time within* five years from January, 1839—thus by one sweeping construction denying to the Company the right of investing its capital stock in bonds and mortgages, a right hitherto unquestioned in the Company, and made by its charter one of the great and leading objects of the institution.

At the passage of the act of 1838, the first instalment up-

on all the shares, amounting to $200,000, had been paid in. Now, if the stockholders choose to avoid a forfeiture, by availing themselves, as they doubtless would do, of the privilege of surrendering their unpaid stock, then the effect of the construction given to this act is to throw upon the Company all of this surrendered stock, without the power to re-issue it for bonds and mortgages, and thus reduce the capital of the bank from two millions to $200,000, when by the very terms of the charter, the Company had the power of increasing it to four millions.

If Lanier is to be considered a subscriber to stock from July, 1839, the time of his purchase, then the Company were authorized, under the original and amendatory acts of 1836 and 1837, to give him a credit of five years from the date of his subscription. But if the act of 1838 applies to the re-issued stock, then, in the case of Lanier, and all others who might purchase stock after January, 1839, the provisions of the act instead of being, as is conceded, an extension of the time of payment before allowed, would be a limitation; and thus by the rule of interpretation adopted, the fifth section would extend the time of payment to the first subscribers, and without any words to that effect, limit it to others, who it is contended could only become stockholders by subscribing in the same mode and under the same rules and restrictions as originally provided. It is a strange rule of construction that would thus construe an express grant, which, while on its face it extended the power of a corporation, was to be considered as a restriction on its original powers. And it is something new in the history of corporations that this institution, then in prosperous circumstances, with a charter containing most extraordinary grants of power, should be represented but three years after its organization as a suppliant before the Legislature, praying that its privileges be curtailed, and

that the power under which it could exercise its corporate franchises for the term of fifty years, should be limited to five years from January, 1839.

The construction which is sought to be given to this act, is at variance with both the letter and spirit of the charter, and would lead to endless embarrassment and difficulty. The fifth section of the act, it is manifest, has reference exclusively to contracts then subsisting, and cannot apply to future contracts, in relation to the sale of surrendered stock. The third section of the same act contains a new grant to the corporation, well defined as to power, and unrestricted as to time—a power which the Company could legitimately exercise in the sale of its stock, as often as it was surrendered, and within the duration of its charter.

The substance of the entire defence made in this case is based upon the alleged misconduct on the part of the directors of this institution. To say that a party can avoid his contract, and thereby diminish the fund which was designed as a security, for the benefit of the public, upon the pretence that there was some abuse of the corporate powers, or mismanagement on the part of the Board of Directors, in making the contract, is to pervert the well settled principles of law, and, under color of its sanction, to open the door for the consummation of fraud upon individuals and the public. Neither party can escape the obligation created by the sale and purchase of this stock. Admitting the contract to have been made contrar y to the letter of the charter, it is not thereby void, and the respondent cannot avail himself of any merely unlawful act by himself and the directors, whether only designed or fully consummated, to perpetrate a greater fraud on the creditors of the bank. See 16 Serg. and Rawl., 144

In the case of the Bank of South Carolina vs. Hammond, 1 Rich. L. Rep., 288, the defence was, that the contract

was in violation of the charter, and void.  The Court held, that a contract with a corporation may be binding on the parties, though it was an abuse of the corporate powers, and for which the corporation was answerable to the Government which created it ; and that it was too strict to insist that a power which is contained in a general grant, and which in various forms may be pertinent to the purpose of a corporation, may be restricted to a particular form of direction for its exercise.  The same defence was relied on in the case of Little vs. O'Brian, 9 Mass. R., 423, and the Court say, whether for this violation of the charter, the Government may not seize their franchises, upon due process, is a question not now before us.  It is sufficient to say it does not lie in the mouth of a stockholder for this cause, to avoid his contract, which as between him and the company, was made upon a sufficient consideration.  In the case of Fleckner vs. Bank U. S., 8 Wheat., 338, the Court say, that the defence set up was merely a violation of the charter, for which a remedy may be applied by the Government, and conceding the bank to have violated its charter in this particular transaction, it is not easy to perceive how that objection could be available. The act did not say that such a transaction or contract was *ipso facto* void.  It remained to be shown how if the bank had a general right to discount notes, a contract, *not made void* by the act itself, could on that account be avoided by the party.  See also Chester Glass Co. vs. Dewy, 16 Mass. R., 94.

These authorities are based upon this general principle, that all acts of incorporation are held to be directory unless they expressly avoid all security taken other than that prescribed, and that although the transaction may be culpable on the part of the directors, and ground of forfeiture, in a question between the Government and corporation, yet

the security taken may be enforced against him who gave it. Ang. & Ames, Corp., 190, and Palmer vs. Lawrence, 3 Sanford R., 162; Brower vs. Appleby, 1 *ibid*. 108.

It is conceded that this institution is insolvent, and it connot be disputed that when a corporation becomes insolvent, the officers are trustees for creditors, and the same principles of law which would be applicable to a suit in favor of creditors, would apply in all their force to the case before us.

For the reasons contained in this opinion, we are compelled to reverse the opinion of the Court below, and the complainant is entitled to a decree of foreclosure, with costs, and for the amount of principal and interest due upon the bond and mortgage.

ANDERSON, C. J., delivered the following dissenting opinion:

I differ with a majority of the Court in the conclusions to which it has come; and the importance of the case and the general interest of the questions involved in it, induce me to regard it as my duty to give somewhat at length the reasons which have prompted my dissent.

The respondent, under the privilege given by our statute of 1828, insists in his answer, " by way of demurrer to the " said bill of complaint that the State of Florida, who is " set forth in said bill as one of the complainants, has no " interest in the subject matter of the said bill of complaint."

The judgment of the Court upon this demurrer does not seem to have been asked for by either party until the final hearing of the cause.

I differ from the Court in their judgment upon this demurrer, and regard it as a sufficient answer to the present bill, notwithstanding the counsel of the respondent expres-

sed a desire to have the case decided upon its substantial merits, and not sent back for a defect that may allow of amendment. Objections not intended to be pressed should not be put upon the record, or if put there inadvertently, should be waived with the same formality. I regard it as our duty to decide upon the record as presented to us.

That the misjoinder of a co-plaintiff is a fatal error when taken advantage of by a demurrer or plea, is a familiar and well settled principle of equity pleading and practice. Story's Eq. Pl., § 544; Mitford Eq. Pl., p. 399; King of Spain vs. Machado, 4 Russ., 228; Cuff vs. Platell, 4 Russ, 242.

To my mind, it is apparent on the face of the bill that the State of Florida has no interest in the subject matter of this controversy, for though it is doubtless true as stated by complainant's counsel, that the demurrer admits the facts as set forth in the bill, yet when legal inferences are set forth as facts, though they may be called facts, it is our duty to regard them in their true light as matters of law and not to receive them as true unless they are so. A demurrer confesses matters of fact only and not matters of law. Ld. Raymond, 18.

When for instance, the complainant speaks of the liability of the State of Florida on the bonds of the company, as a necessary consequence of the guarantee given by the agents of the Federal Government when acting as a Territorial Legislature in Florida, this liability, though assumed as a matter of fact, is but a deduction of law, and therefore it is not admitted to be true by the respondent's demurrer. The real facts set forth, such as the guarantee made by the Territorial Government, and the deposit of the certain bonds with the Governor of the State, may be true, and are admitted to be so, but they do not warrant the complainant in making a co-complainant of the State of Florida,

apart from the legal conclusion which he has assumed as facts.

I do not mean to discuss here the soundness of this legal conclusion. It is enough for my present purpose to distinguish it as a matter of law, rather than a matter of fact, and that as such, it is not admitted by the demurrer. Upon the face of the bill then, admitting all the facts there alleged to be true, it does not appear that the State of Florida has any interest in the bond or mortgage or promissory notes of the respondent, and there can be no doubt that on a general demurrer under the authority of the case of the King of Spain vs. Machado, the bill would have to be dismissed. For I do not consider as at all tenable the position assumed by complainant's counsel, that the bill can be defended from the imputed defect under the legal maxim that a mere *scintilla juris* will justify the joinder of a co-plaintiff.

The maxim is true, but its application in this case is unwarranted. If the State of Florida has any interest in these bonds and mortgages at all, it is far from being a slight one. It is either nothing or of great importance. It can in no correct sense be called a *spark*. The alleged deposit of the securities with the Governor could scarcely give to the State any interest which it had not otherwise. Such a deposit could only be with the incumbent as an individual, not as a representative of the State. Though there is no general demurrer in this case, the respondent has insisted in his answer, on the special matter of which I have been speaking, by way of demurrer. The statute of 1828 authorizes him to do so. That statute provides that " the defendant may, in all cases, instead of filing a " formal plea or demurrer, insist on any special matter in " his answer, and have the same benefit thereof as if he had

" pleaded the same matter, or had demurred to the bill."
Thomp. Dig., 458.

I cannot perceive that the respondent having availed
himself of this privilege, stands before us in any different
attitude than if he had demurred to the bill.

The fact of this misjoinder seems to be but very faintly
denied, but the complainant seeks to evade the consequen-
ces of the defect by alleging that a Court will not allow an
objection of this sort, being in the nature of matter in
abatement, to prevail in the last stage of a cause, when
justice can be done to all parties. The Court was referred
to Story's Equity Pleadings, Sec. 237, which says : " It is
" not safe in any case to rely upon the mere non-joinder or
" misjoinder of parties as an objection at the hearing, for
" if the Court can make a decree at the hearing which will
" do entire justice to all the parties, and not prejudice
" their rights, notwithstanding the non-joinder or misjoin-
" der, it will not then allow the objection to prevail." The
extension of the quotation a line or two more would have
shown the true meaning of the Commentator. " An ob-
" jection," he continues, " of this sort should be taken by
" demurrer, plea or answer." He evidently means to con-
fine his caution to those cases where the defendant seeks to
take his adversary by surprise, and starts his objection
orally, at the very last moment.

This was not so in the case before us. The objection is
made and insisted upon by the respondent in the very
opening of his defence, when the complainant, if he had so
chosen, might have had leave to amend and thus avoid the
consequences of his mistake. He did not choose to do so.
The matter of demurrer was set down for hearing, with the
answer in which it was rightfully embodied, and the com-
plainant went to the hearing with full notice of the objec-

22

tion, and of the purpose of respondent to urge it. I think he should abide the consequences he has braved.

I do not mean to be understood as saying that the Chancellor's decree below was justified by the misjoinder alone. It was sufficient to make him dismiss the bill, but without prejudice to the right of the Southern Life Insurance and Trust Company to file another bill; or, under the particular circumstances of the case, he might have given leave to amend at the hearing.

The order of dismissal having been a general one, I will proceed to show why I think, in opposition to a majority of the Court, that it was fully sanctioned by the other matters in the record.

The respondent, while admitting the execution and delivery of the bond and mortgage, charges that they are null and void, mainly because the complainant had no right to sell to him the stock which was the consideration for his indebtedness—that no consideration, therefore, passed to him, and the contract was illegal.

In regard to his other defences, I concur with a majority of the Court, and shall therefore confine myself to the consideration of the one just recited, as it is upon this point that I differ with my brothers.

I take it to be undeniable that " a corporation created " by statute can do those acts and exercise those powers " only which are conferred on it by its charter, or which " are necessary to enable it to perform its functions and " fulfill the purpose of its creation, or which flow by neces- " sary implication from some power granted." 4 Ala. Rep., 562.

" The exercise of the corporate franchise being restrict- " ive of individual rights, cannot be extended beyond the " letter and spirit of the act of incorporation." Beattie vs. Lessee of Knowles, 4 Pet. R., 152.

" A corporation is confined to the sphere of action limit-
" ed by the terms and intention of the charter." An-
gell & Ames on Corp., 68 ; 12 Wheaton's Rep., 64 ; 4 *ibid*,
518 ; 6 *ibid*, 593.

These stringent rules of restraint may be legitimately
carried yet further, for when a mode is prescribed in the
charter for the action of the corporation, that mode must
be used, and any other is unlawful. Chief Justice Mar-
shall, in the case of Head and Amory vs. the Providence
Insurance Company, said, in speaking of the power of cor-
porations : " The act of incorporation is to them an ena-
" bling act—it gives to them all the powers they possess ;
" it enables them to contract, and when it prescribes to
" them a mode of contracting, *they must observe that*
" *mode*, or the instrument no more creates a contract than
" if the body never had been incorpated." 1 Pet. Cond.
Rep., 375.

These rules are well established, and we may proceed
at once to apply them as a test to the contract in question.

Let us inquire, then,

1st. If the contract was such an one as the Company, by
its act of incorporation, was enabled to make or cause to
be made ;

2d. Whether the charter of the Company prescribed a
mode of making such a contract, and, if so, whether it was
observed in this instance. An examination of the act of
incorporation in reference to these points, will enable us
to determine the character of the contract and the sufficien-
cy of the respondent's defence.

I have no difficulty in relation to the first proposed in-
quiry. There was an express provision in the charter in
reference to the particular stock bought by Lanier. The
3d section of the amendatory act of 1838 provides " that
" the Company may, in their discretion, authorize any of

" the stockholders to surrender their certificates of capital
" stock, and take an amount of certificates of full stock
" equal to the amount of payment on the stock so surren-
" dered, and the said Company may hold or re-issue such
" overplus stock." Thomp. Dig., 317.

The record shows that the stock purchased by Lanier,
was stock surrendered under the provisions of this section,
and as the authority to re-issue is expressly given, there
can be no question of the authority of the company to con-
tract with Lanier for the sale of the stock, if they contrac-
ted in the proper mode and through the proper agents. In
re-issuing the stock to Lanier, they were only doing what
their charter enabled them to do.

Before proceeding to the second inquiry, let us define in
precise and accurate terms, what was done by the com-
pany in this transaction, and we shall thereby better un-
derstand whether any particular mode was prescribed by
the charter in which that particular thing should be done.

The thing done was the re-issue of stock which had been
surrendered under the license granted in the amendatory
act of 1838, and it was done under that clause of the act
which allowed the company to hold or re-issue the same
stock. It was done directly by the company without the
agency or intervention of the commissioners, and the com-
pany received from Lanier in payment of this stock, his bond
and mortgage. Is there any mode for doing this, prescri-
bed in the charter, different from the one adopted? The
affirmative is maintained by the respondent, and it is upon
the maintenance of this affirmation that his counsel chiefly
relies.

The mode may be prescribed directly or indirectly. As
nothing is said in the act of 1838 which authorizes the re-
issue of the surrendered stock, as to the mode in which the
re-issue was to be made, and the surrender and re-issue

were not contemplated in the original act, it must be admitted that there are no direct instructions as to the mode in which such stock shall be sold, and we must look into the several acts to see if the mode is prescribed indirectly any where by the legislature. If it be so, those instructions, though indirectly made, are as imperative and obligatory as if made in direct terms.

In the 9th section of the act of incorporation, Lott Clark, Robert Raymond Reid, and Thomas Douglas, are appointed commissioners to open books for subscriptions to the capital stock. The 12th section prescribes that each subscriber, at the time of subscribing, shall pay to the commissioners ten dollars on each share by him subscribed, and that in three years the whole amount shall be paid. The last clause of this section is so material to the argument that I will transcribe it at large. It is in these words: "The shares of every stockholder omitting to make such "payment, shall be forfeited, together with all previous "payments made thereon, and the books shall be again "opened as directed in the 9th section for subscription, "and so from time to time until all shares are subscribed "and paid for."

The last clause of the 9th section prolonged the authority of the commissioners for three years, in case the whole stock should not be taken within that period, and the clause just recited from the 12th section further extends their authority in reference to the forfeited stock till all shares are subscribed and paid for.

It is now important to inquire in what respect, if any, this forfeited stock, whose re-subscription is thus provided for in a mode plainly and directly presented, differs from the surrendered stock spoken of in the 3d section of the amendatory act of 1838. To forfeit is to lose the right to possess, by some neglect or crime—to surrender in the

sense here used, is to give up the right to possess, voluntarily, and not as a penalty for neglect. The original charter enforced the surrender of unpaid for stock, as a penalty —the amended charter allowed the surrender without the penalty. The forfeited stock became subject to re-subscription under the charter, as the surrendered stock did to re-issue under the amendatory act. In all respects, except as to relief from the forfeiture of moneys already paid, there was an identity in the forfeited and in the surrendered stock.

Again, what would have become of this surrendered stock if the act of 1838 had not passed? Those who did not duly pay their instalments would have forfeited it, and the books would have been again opened by the commissioners, and each new subscriber would have been required to pay ten per cent. at the time of subscribing, and the whole price within three years. If this surrendered stock then, but for the amendatory act, would have been necessarily forfeited for non-payment, and afterwards disposed of in the mode just mentioned, then if there is any change in the mode of its forfeiture and subsequent re-issue, it must be authorized by that act. The main object of that act is obviously to relieve the stockholders who had made partial payments, from the penalty imposed by the original act, and neither its terms nor its spirit, in any part of it, indicate the intent of the legislature to change the mode in which the surrendered stock should be re-issued. The simplest rules of construction require that in the interpretation of an amendatory act, reference should be constantly had to the act designed to be amended, and the amending act should not be understood as importing a greater change than its obvious intent and meaning indicate. The purpose of the 3d section of the act of 1838 was to relieve the subscribers from a penalty imposed by the original act,

and no more.  To this purpose, its operation should be confined, since neither its letter nor spirit import any thing more.

It will be observed, too, that the change proposed in this section is discretionary, not mandatory—discretionary both with the company and with the stockholder, for both were only permitted, not required, to receive or to make a surrender of stock.  It might very well have happened after the passage of that act, that either the company or the stockholder would have declined to exercise the discretion allowed, and in that case, unpaid for stock would have been forfeited and subject to the original conditions of re-subscription.  And yet it is supposed that the exercise of the discretionary privilege offered by the amendment, has wrought a radical change in the stock given up, so as to release it from all rules, regulating the mode of re-subscription originally imposed in view of the public policy and interests.

The conclusion to which this reasoning leads us, is sought to be avoided by making an essential distinction in the character and condition of the original stock for which the commissioners were authorized to take subscriptions, and this surrendered stock which " the said company may re-issue."  This distinction is based on the assumption that the commissioners were only employed to adopt the initiatory steps for putting the corporation into existence, and that their functions then ceased.  Such, I am very clear, was not the design of the legislature.

The 11th section provides that the Governor, after being duly notified of the subscription of the entire stock, the actual payment of $200,000, the appointment of trustees and their readiness to commence business, should make proclamation, and on its publication the company should commence business.  At this point, when all the stock had

been subscribed, and the company fully organized, if it had been intended to transfer the duties of the commissioners to the company, it would have been appropriate to terminate their official existence, either by express words or by making no further mention of them or their duties. But the 12th section, indicating the anxiety of the legislature, that the whole capital stock should be paid for within three years after subscription, provides for such payment under the penalty of forfeiture, and jealous lest the corporation might not take the new subscriptions for the forfeited stock, in the mode prescribed by law, express provision is made that " the books shall be again opened as " directed in the 9th section for subscription, and so from " time to time until all shares are subscribed and paid for." The 9th section, it will be recollected, provides that the subscriptions shall be taken by the commissioners.

The reason of this caution is sufficiently obvious, and I cannot see why the same salutary care should not have been intended in reference to the surrendered as well as the forfeited stock. All subscriptions to the forfeited stock, though made after the perfect organization of the Company, are by express enactment to be made precisely as subscriptions to the original stock, and, what is more pertinent to the argument, the same system is perpetuated until " *all shares are paid for*." Where is this system which involves the constant agency of the Commissioners, in taking subscriptions *till the last share of stock is paid for*— where is it abandoned ? And what is there in the amendatory act to warrant us in supposing that the Legislature designed to place the surrendered stock beyond the operation of this conservative provision? It is undeniable that the provision which makes the Commissioners the sole agents in receiving subscriptions to stock, and in express terms keeping that agency alive not only until the stock

is subscribed for, but until those subscriptions are, actually paid up in full—it is undeniable, I say, that this provision embraces all the stock of the Company; and therefore the surrendered stock, unless an exception be somewhere made. There is nothing in the amendatory act to indicate such an exception. Its primary object was to relieve the non-paying subscribers from forfeiting their previous payments, as well as their stock; and to understand it as at the same time changing the mode in which the relinquished stock should be re-issued, is to suppose that the Legislature had abandoned all the guards and restrictions so clearly contemplated and so carefully provided for in the previous enactment. Such an inference is not warranted by the language of the section, nor by any indication of the Legislative will to be anywhere found in the act, and leads to too essential and radical a change in the public policy to be justified by mere implication.

It is said in answer to these suggestions, that authority is expressly given to the Company to re-issue the stock after surrender, and it is thence inferred that the stock was held by the Company as its own property, for it is said that it belonged to the Company, and that it might be disposed of at its pleasure. This might be if the stock, after surrender and before re-issue, was property at all. But there is a fundamental difference between stock after the terms of its purchase have been complied with, and it has become the property of the subscribers; and when it is as property yet in embryo, and only subject to acquisition. Stock may be defined to be a portion of the chartered privileges granted by the act of incorporation. These privileges are granted on certain conditions, and until the conditions are performed, the grant is incomplete, and no property passes out of the grantor. The stock surrendered to the company under the provisions of the act of 1838, could

in no sense be regarded as the property of the company, though the company was authorized to hold or to re-issue it. It could in its then condition be the property of no one. It was only the representative of a portion of the chartered rights which the sovereign was ready to bestow upon certain conditions, but which could not pass out of the sovereign till the conditions were complied with. It was therefore not the property of the company, and their right to re-issue and transfer property in it to another, could not be separated from the appointed mode of transfer—a condition imperatively necessary to its very existence as property.

I might perhaps stop here, and conclude that as a mode was prescribed by the charter, in which all forfeited or surrendered stock should be re-issued until the whole was paid for, and as the contract with Lanier for the sale of stock, was made in another mode, it was therefore invalid, but in examining the several acts, I find another injunction of the legislature, which has been palpably violated in this case, and which seems to me of much importance, though not noticed by counsel on either side. It will be perceived that there is apparent throughout all the several acts a determination on the part of the Legislature that the stock subscribed for should be paid for before a definite period—that period extended indulgently from time to time, but always made well defined and fixed. The incorporating act of 1835 requires that all the stock shall be paid for within three years, under the penalty of forfeiture —the acts of 1836 and 1837, passed doubtless at the solicitation of the Company, extend the period for calling in the instalments, subsequent to the ten per cent. cash instalment, one and two years respectively. In 1838, the Company applied for further indulgence, when the provision was made for consolidating the stock. At the same

time, the postponement of instalments, which had been the chief purpose of the acts of 1836 and 1837, was fixed upon a permanent though indulgent basis. Modifying the policy of exacting full payment for the stock within three years from 1835, and within one and two years thereafter, the 5th section of the act of 1838, being the final provision on the subject, provides that " the said Company may call " in the residue of their capital stock at any time within " the period of five years from and after the 1st day of Jan- " nary, 1839."

The language here, though permissive only, is a qualification of the imperative language of the 12th section of the original charter, and it imports that the application of the imperative requisition of full payment on the stock may be postponed from the time first fixed to the period here indicated. The Legislature clearly intended, as no doubt the public interests demanded, that the stock in this institution should not be merely nominal, but should be paid for in full before a fixed time, and having, from time to time, at the solicitation of the Company, enlarged the term of final payment, their indulgence was at length exhausted, and five years from the first day of January, 1839, was definitively fixed upon as the latest day to which the full payment on the stock should be postponed. That this is the sense in which the word *call* is used in this section is clear, from the relation in which it stands to *payment* in the act of 1837.

A sale made by the trustees of the stock, by which they contracted that no part of the consideration money should be required until after the full time had elapsed which had been authoritatively fixed as the utmost period to which the last payment should be postponed, is surely without authority from the charter, and if without such authority, is necessarily void, from the utter impotency of the con-

tracting party to make such a contract. Yet such is the contract made with Lanier. He is sold one hundred shares of stock, on the consideration that he will pay for them within five years from the 30th July, 1839, while the utmost ability of the Company—all its power being derived from the charter—was to sell its shares of stock for a consideration to be paid in full within five years from the 1st of January of the same year. Here we find two parties contracting with each other upon conditions expressly prohibited by law, and yet one of them comes into a Court of Justice and solicits its aid to enforce this contract. One of these parties owes its very existence to the law it is violating, and the subject matter of the contract—that is, the stock—is created by the same law. The former cannot act —the latter cannot exist, without and beyond the act of incorporation—and yet that act nowhere sanctions the contract sought to be enforced. On the contrary, its provisions, clearly forbidding such a contract, are treated with defiance—provisions, too, which are not mere matters of form, involving no principle, but imposing safeguards necessary to the public interests, as a restraint upon the abuse of the large privileges bestowed by the charter. By the sanctions provided in the different parts of the act, to enforce the payments of the subscriptions, the stock which is the subject of this contract became forfeit before the time arrived at which payment from Lanier was required; and yet the offending party comes to a Court of Equity, asking its aid in collecting the money the promise of which was obtained by such an utter violation of law.

The argument that the fifth section is only permissive, and not restrictive, is totally at variance with the assumption by which the sale to Lanier was justified. The disregard in that case of all the modes and terms which had been prescribed for sales of stock, is defended on the ground

that the authority given in the 3d section released the Company from all restraints—a conclusion which makes the 5th section utterly absurd and unmeaning.

I have heretofore considered this contract in reference to what seems to me to be the plain requirements of the law, as to the mode prescribed for its execution and the agency by which it was to be executed. A single consideration of the reason and policy of the law suffices to satisfy me that I have not mistaken the design of the Legislature. It is apparent from the purport of the acts of the Legislature of 1836 and 1837, that at the date of the act of 1838, but little if any more than the first cash instalment of ten per cent. had been paid by the subscribers. By the act of 1838, unpaid for stock might be surrendered, and, according to the construction put upon the 3d section, might be re-issued, upon bonds and mortgages, payable in five or fifty years from the date of sale. A capital of four millions might have been raised in this mode, on which unsubstantial capital the Company was invested with almost unexampled powers—with banking powers and privileges —with power to insure lives—with capacity to become trustee for the estates of infants, and others, and to secure annuities—its ostensible capital being four millions, its real capital being but the twentieth part of that sum. These four millions, too, of nominal capital, were to be secured, not by the agency of disinterested Commissioners, chosen by the government in view of the magnitude of the trust confided to them, and the peculiarly sacred character of the funds which were to rest for their safety upon these securities, but taken by the Company itself, without accountability or supervision of any sort.

It seems to me to be vain to say that there is no difference between selling stock for bonds and mortgages, as was done in this case, and selling it for cash and afterwards

lending the same cash upon bonds and mortgages. According to the distinction I have already made between stock paid for, and stock only offered for sale—the re-issued stock when offered for subscription was not property as money would have been, and it might well be, that the company, in disposing of a share of the chartered privileges, of which it is supposed they were the distributors, would not exercise the vigilance which would have attended an investment of actual money; and it might well be, too, as almost the entire stock was to be thus re-issued, that a combination might have been made to sell their chartered privileges for nominal or insufficient securities, and thereby qualify themselves to become the great trustees of the country and the fiduciaries, *par excellence*, of its most sacred interests. It was against possible fraud and evils of this character, that I consider the Legislature to have wisely and carefully guarded, both in requiring the Commissioners to supervise the subscriptions and in providing that the stock should be actually paid for in full before the first of January, 1844; and especially in the emphatic perpetuation of the authority and duty of the Commissioners, not till the company was organized—not till the stock was sold for bonds and mortgages, but till the stock was actually *paid for*.

I cannot regard as important the suggestion made by counsel, that Lanier being a stockholder, should be held more strictly to the performance of this contract than another person. It is a well settled rule, that a corporation in dealing with a stockholder, deals with him as with a stranger, and as such, Lanier should be regarded in this controversy. Besides, this allegation begs the question in dispute. I do not consider Lanier to be a stockholder, and the violation of law of which I have been speaking consists in vainly attempting to make him so in face of the prohi-

bitions of the charter.   Neither do I feel the force of the
argument, that Lanier's subsequent recognition of the con-
tract, by borrowing money on the stock, was a waiver of
the fraud and illegality.   The authorities referred to, speak
of fraud between the parties, and it might well be in some
cases, that a ratification of the contract after the discovery
of the fraud, might amount to a waiver.   But the view I
have taken of this case shows, that the fraud was perpetra-
ted against the Government, and the act attempted to be
done was in violation of the public law.   The consent of
the parties attempting the fraud could not at any future
time, any more than at first, give sanction to such a fraud,
or any power to the corporation which its charter with-
held.

As this case is presented, it is not necessary to inquire
whether the intervention of the rights of creditors would
make any change in the liability and responsibilities of
Lanier, but as it is urged that the trustees of the company,
which is admitted to be insolvent, should be regarded as
trustees for the creditors, I think it right to say in reply,
that I cannot think that a contract attempted to be made
by a party, without authority to make such a contract, and
in direct violation of law, can be maintained as a contract
for any purpose.

That individuals dealing with a banking company may
be defrauded by a collusive arrangement between the com-
pany and its ostensible stockholders, is true, but it does
not invalidate the principles I have endeavored to estab-
lish, nor the soundness of that policy which should prompt
all Courts to frown upon all violations of law, regardless
of any partial or temporary interests which the connivance
at wrong might promote.   This alleged facility of imposing
upon the public, shows the wisdom of the Legislature in
requiring, (as I have attempted to show has been done,)

the interposition of Commissioners of its own choice in making contracts for the purchase of stock, and furnishes another argument against such a construction of the statute, as throws wide open the door for the admission of the frauds and evils apprehended. Besides, if chartered companies do possess greater facilities for practising frauds than individuals, this facility for doing injustice should prompt the Courts to be more stern in confining them rigidly within their chartered privileges, while individuals should learn to be more vigilant in dealing with them, and the Legislature of the State be more faithful to their duties as visitors. And it may be in this case, too, that when the creditors come to look after their rights, they may find responsibilities existing elsewhere, in relation to this same stock which was sought to be sold to Lanier—responsibilities springing from the original subscriptions, and which may not have been released, even by the intervention of legislative action.